2012 CO 19

**AIR WISCONSIN AIRLINES CORPORATION, a Delaware corporation, Petitioner**

v.

**William L. HOEPER, Respondent.**

**No. 09SC1050.**

Supreme Court of Colorado, En Banc.

March 19, 2012.

Rehearing Denied April 23, 2012.

Jaudon & Avery LLP, Alan D. Avery, David H. Yun, Jared R. Ellis, Denver, Colorado, Fafinski Mary & Johnson, P.A., Donald Chance Mark, Jr., Alyson M. Palmer, Eden Prairie, Minnesota, Attorneys for Petitioner.

Overturf McGath Hull & Doherty, P.C., Scott A. McGath, Jason P. Rietz, Nikolai N. Frant, Lindsey W. Jay, Denver, Colorado, Attorneys for Respondent.

John F. Walsh, United States Attorney, Paul Farley, Assistant United States Attorney, Denver, Colorado, U.S. Department of Justice, Eric Holder, Attorney General, Tony West, Assistant Attorney General, Douglas N. Letter, Appellate Staff, Abby C. Wright, Appellate Staff, Civil Division, Washington, D.C., Attorneys for Amicus Curiae the United States.

Levine Sullivan Koch & Schulz, L.L.P., Thomas B. Kelley, Steven D. Zansberg, Christopher P. Beall, Denver, Colorado, Attorneys for Amicus Curiae the Colorado Press Association.

Justice RICE delivered the Opinion of the Court.

¶ 1 In this defamation action, we address whether a trial court must decide before trial if a party is immune from liability pursuant to the Aviation and Transportation Security Act (ATSA), 49 U.S.C. section 44941 (2006). Applying the principles of federal qualified immunity to the immunity conferred by the ATSA, we conclude that the trial court in this case erred by submitting to the jury the question of whether Air Wisconsin was immune from suit. This error, however, is harmless because we conclude that Air Wisconsin is not entitled to immunity. In addition, our independent review of the record reveals clear and convincing evidence to support a finding of actual malice. We also hold that Air Wisconsin's statements are not protected as opinion and that the evidence is sufficient to support the jury's determination that the statements were false. Accordingly, we affirm the judgment of the court of appeals.

## I. Background

¶ 2 Air Wisconsin, a commercial airline, employed William Hoeper as a pilot. The Transportation Security Administration (TSA) had issued Hoeper a firearm under a federal statute that authorizes TSA to deputize volunteer pilots as federal law enforcement officers "to defend the flight decks of aircraft ... against acts of criminal violence or air piracy." 49 U.S.C. § 44921(a) (2006). Such a pilot is known as a federal flight deck officer (FFDO). *Id.*

¶ 3 After discontinuing its use of the type of aircraft that Hoeper had piloted for many years, Air Wisconsin required Hoeper to undertake training and pass a test certifying his proficiency in piloting another type of aircraft. Hoeper failed three such tests. Patrick Doyle, a manager at Air Wisconsin involved in Hoeper's testing, testified that after the second failed test, Hoeper lost his temper with Doyle. Doyle's contemporaneous notes of the second test day, however,

did not mention the confrontation.[1] In addition, testimony established that Doyle and Hoeper drove together to their hotel after the meeting and had a drink together at the hotel bar. Also, another test administrator testified that, after the third failed test, Hoeper confronted him, but Hoeper's demeanor was not threatening.

¶ 4 After the three failed tests, Air Wisconsin gave Hoeper one last opportunity to pass the test. Hoeper knew that he would likely lose his job if he failed this fourth test. He flew from his home in Denver to Virginia to take the fourth test.

¶ 5 During the test, Hoeper became angry with the test administrators because he believed that the test administrators were deliberately sabotaging his testing. One administrator, Mark Schuerman, testified at trial that Hoeper ended the test abruptly, raised his voice at Schuerman, and used profanity. Schuerman testified that Hoeper's outburst startled him and that he feared for his physical safety during the confrontation, but not after the confrontation ended. Testimony also established that Hoeper told Schuerman that Hoeper intended to call the legal representative of the airline pilots' union to which he belonged.

¶ 6 After Hoeper left the testing facility, Schuerman told Doyle about the confrontation. Specifically, Schuerman testified that he told Doyle only that Hoeper blew up at him and was "very angry with [him]." Schuerman did not tell Doyle that he or anyone else at the testing center believed Hoeper would harm them or others. Doyle then instructed another Air Wisconsin employee who participated in the failed test to drive Hoeper to the airport and Doyle booked Hoeper on a flight from Virginia back to Denver. Doyle never sought nor received any additional information about the confrontation from others who were at the testing center that day or about Hoeper's demeanor after the confrontation.

¶ 7 Doyle knew that Hoeper was an FFDO pilot. He did not know if Hoeper had his government-issued firearm with him on the trip to Virginia, but he knew that Hoeper would have violated FFDO rules by carrying the firearm as a passenger on the airplane from Denver to Virginia. He also never sought nor received any additional information about whether Hoeper actually brought his firearm to Virginia.

¶ 8 Based upon this information, Doyle called TSA to report Hoeper as a possible threat.[2] By the time Doyle called TSA, Hoeper had been at the airport for about two hours waiting for his flight. After the call, Doyle wrote in his personal notes that he had told TSA that Hoeper was "a disgruntled employee (an FFDO who may be armed)" and that he was "concerned about the whereabouts of [Hoeper's] firearm, and [Hoeper's] mental stability at that time." At trial, Doyle denied having told TSA anything about Hoeper's mental stability. He added that he did not have the ability to assess Hoeper's mental stability.

¶ 9 The jury found that Doyle made two statements to TSA:

(a) [Hoeper] was an FFDO who may be armed. He was traveling from IAD–DEN later that day and we were concerned about his mental stability and the whereabouts of his firearm.

(b) Unstable pilot in FFDO program was terminated today.

¶ 10 In response, TSA officials arrested Hoeper and searched him.

¶ 11 The day after this incident, Doyle made notes about the meeting with Hoeper that occurred immediately after the second failed test. Doyle wrote that, after Hoeper lost his temper, Doyle ended the meeting "for fear of [his] own physical harm." He also noted that "[a]fter heated discussion with [Hoeper], and due to my concerns for my safety," Doyle did not fully fill out a certain FFA form regarding the failed test. Doyle later changed these notes to read "due

1. As discussed below, after Hoeper's fourth failed test, Doyle finally made notes of this confrontation, stating that Hoeper's actions after this second test caused Doyle to fear for his own safety and that of others at the testing facility.

2. The parties agree that Air Wisconsin is legally responsible for Doyle's statements.

to my concerns for my safety and the safety of others at the [testing facility]."

¶ 12 Hoeper brought this action in Colorado against Air Wisconsin for defamation under Virginia law, among other claims. The parties agree that Virginia law applies to the substance of Hoeper's claims in this case.

¶ 13 Air Wisconsin moved for summary judgment,[3] asserting that it was entitled to immunity as a matter of law under the ATSA. The trial court denied the motion because it determined that the jury was entitled to resolve disputed issues of fact that controlled the determination of immunity. Air Wisconsin also moved for a directed verdict under the same theory after the close of evidence, which the trial court also denied.

¶ 14 The trial court instructed the jury on the components of ATSA immunity and instructed that the jury could not find for Hoeper on the defamation claim if it determined that Air Wisconsin was immune under the ATSA. The jury returned a verdict in favor of Hoeper. The jury found by clear and convincing evidence that the two statements were defamatory and that Air Wisconsin made one or more of the statements "knowing that they were false, or so recklessly as to amount to a willful disregard for the truth."

¶ 15 Air Wisconsin appealed and the court of appeals affirmed. The court of appeals determined that the question of whether the judge or jury decides immunity under the ATSA is a procedural issue governed by Colorado law. It concluded that, under Colorado law, the trial court properly allowed the jury to determine whether the ATSA granted Air Wisconsin immunity in this case. The court of appeals also determined that clear and convincing evidence supported the jury's finding of actual malice and that the statements Doyle made were not protected as opinion or as substantially true. Air Wisconsin petitioned for certiorari, which we granted.[4]

## II. ATSA Immunity

¶ 16 Federal law, not Colorado law, controls our determination of whether the judge or jury decides the issue of immunity under the ATSA. Applying the federal law of qualified immunity, we conclude that the immunity conferred by the ATSA is immunity from suit, not merely immunity from liability for damages. The trial court must therefore determine before trial whether an air carrier is immune from suit. Although the trial court in this case erred by submitting the question to the jury, the error is harmless because we conclude that Air Wisconsin is not entitled to immunity under the ATSA.

### A. Federal Law Controls

■ ¶ 17 The court of appeals determined that the right to a civil jury trial in Colorado is procedural and therefore "the allocation of decision-making between judge and jury is a procedural question to be governed by Colorado law." *Hoeper v. Air Wis. Airlines Corp.*, 232 P.3d 230, 237 (Colo.App.2009). We disagree.

■ ¶ 18 Colorado courts follow federal procedure when deciding immunity under federal law. For example, we look to federal procedures in determining whether a denial of summary judgment in a federal qualified immunity case is immediately appealable.

3. We recognize that the common method for raising the issue of immunity from suit is to file a motion to dismiss pursuant to C.R.C.P. 12(b)(1). See *Moody v. Ungerer*, 885 P.2d 200, 201 (Colo. 1994). In this case, it would have been appropriate for the trial court to have treated the summary judgment motion as a 12(b)(1) motion. Nonetheless, the fact that Air Wisconsin raised the contention in a motion for summary judgment allowed the trial court to decide the immunity question before the trial.

4. We granted certiorari on the following issues:
   1. Whether the court of appeals erred in finding that the trial court properly submitted the issue of Air Wisconsin's qualified immunity under the Aviation Transportation Security Act to the jury under Colorado law where federal courts generally require resolution of qualified immunity as a matter of law early in the proceedings.
   2. Whether the court of appeals properly found that a de novo review of the record demonstrated clear and convincing evidence of actual malice.
   3. Whether the court of appeals erred in finding that Air Wisconsin's statements were not substantially true and not non-actionable statements of opinion.

*Furlong v. Gardner,* 956 P.2d 545, 552 (Colo. 1998); *see also Awad v. Breeze,* 129 P.3d 1039, 1045 (Colo.App.2005). In addition, we have consulted federal law in determining whether immunity under the Health Care Quality Improvement Act (HCQIA), 42 U.S.C. section 11111 (2006), is a question of law for the court to decide. *N. Colo. Med. Ctr., Inc. v. Nicholas,* 27 P.3d 828, 838 (Colo. 2001). We therefore consult federal law to determine whether the court must decide the question of immunity under the ATSA before trial.

■ ¶ 19 Moreover, we must presume that, "in the absence of a plain indication to the contrary, ... Congress when it enacts a statute is not making the application of the federal act dependent on state law." *Miss. Band of Choctaw Indians v. Holyfield,* 490 U.S. 30, 43, 109 S.Ct. 1597, 104 L.Ed.2d 29 (1989) (quoting *Jerome v. United States,* 318 U.S. 101, 104, 63 S.Ct. 483, 87 L.Ed. 640 (1943)). Early resolution of federal qualified immunity is essential because it is "immunity from suit rather than a mere defense to liability [that] is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Congress did not intend for state law to govern the timing of the determination of immunity because the early resolution of that issue is an important facet of the protection Congress enacted. We therefore apply federal law to determine whether immunity is a question of law for the trial court to decide.

### B. Immunity Under the ATSA is Determined by the Court

■ ¶ 20 Applying the purpose of federal qualified immunity law, we conclude that immunity under the ATSA is a question of law to be determined by the trial court before trial.

■ ¶ 21 Federal law contains the judicially-created doctrine of qualified immunity, *see Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and other statutorily-granted immunities, *see, e.g.,* 42 U.S.C. section 11111 (immunity under HCQIA). Qualified immunity is based upon a conception that "where [a public] official's

duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'" *Mitchell,* 472 U.S. at 525, 105 S.Ct. 2806 (quoting *Harlow,* 457 U.S. at 819, 102 S.Ct. 2727). These consequences encompass not only liability for damages, but also "the general costs of subjecting officials to the risks of trial—distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service." *Id.* at 526, 105 S.Ct. 2806 (quoting *Harlow,* 457 U.S. at 816, 102 S.Ct. 2727). Federal qualified immunity is therefore immunity from suit, rather than merely a defense to liability. *Id.* As a result, "[i]mmunity ordinarily should be decided by the court long before trial" in order to avoid the consequences of forcing officials to stand trial. *Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (citing *Mitchell,* 472 U.S. at 527–29, 105 S.Ct. 2806).

■ ¶ 22 Because immunity under the ATSA is statutory, we also reference immunities conferred not by federal common law, but by federal statute. Immunity under the HCQIA, for example, only constitutes immunity from damages liability, not immunity from suit. *Singh v. Blue Cross/Blue Shield of Mass., Inc.,* 308 F.3d 25, 35 (1st Cir.2002); *Imperial v. Suburban Hosp. Ass'n, Inc.,* 37 F.3d 1026, 1031 (4th Cir.1994); *Manion v. Evans,* 986 F.2d 1036, 1039–42 (6th Cir.1993); *Decker v. IHC Hosps., Inc.,* 982 F.2d 433, 436 (10th Cir.1992). Federal courts reach this conclusion by analyzing the plain language of the HCQIA and its legislative history. *See Decker,* 982 F.2d at 436. The statute provides that certain medical review bodies "shall not be liable in damages" provided the review meets certain criteria. 42 U.S.C. § 11111(a)(1). Federal courts conclude that this plain language confers only immunity from liability for damages. *See Imperial,* 37 F.3d at 1031; *Decker,* 982 F.2d at 436. Furthermore, courts note that Congress chose this language over language in a previous version of the bill, which stated, "shall not be subject to an action." *See Manion,* 986 F.2d at 1039; *Decker,* 982 F.2d at 436; *see also*

*Imperial,* 37 F.3d at 1031 (noting in the legislative history an intentional change from very broad protection to protection only from damages). Federal courts therefore conclude that the HCQIA confers immunity only from damages liability. *Imperial,* 37 F.3d at 1031; *Manion,* 986 F.2d at 1039; *Decker,* 982 F.2d at 436.

¶ 23 We have interpreted HCQIA immunity as constituting a question of law for the court to decide. *Nicholas,* 27 P.3d at 838. Because the immunity is merely immunity from damages liability, however, a court may make this determination "whenever the record has been sufficiently developed"— even after trial. *Id.* (citing *Bryan v. James E. Holmes Reg'l Med. Ctr.,* 33 F.3d 1318, 1332 (11th Cir.1994)).

¶ 24 Because no federal court has addressed the immunity conferred by the ATSA, we first analyze the ATSA as federal courts would, by applying common principles of statutory construction. The ATSA provides that an air carrier who voluntarily discloses any suspicious transaction relevant to certain aircraft security statutes "shall not be civilly liable" to any person. 49 U.S.C. § 44941(a). Unlike the HCQIA, the ATSA immunity provision does not specifically refer to damages liability. We therefore cannot determine by reference to its plain language the type of immunity the ATSA confers. Moreover, the legislative history does not provide guidance as to the type of immunity intended by Congress. No prior versions of the bill exist, and Congress engaged in no discussion of the immunity standard.

¶ 25 Looking at federal statutory immunity and qualified immunity together, we analyze ATSA immunity according to the rationale underlying the distinction between immunity from suit and immunity from damages liability. Immunity from suit is a greater degree of protection than immunity from damages liability. Federal qualified immunity law includes this greater protection because it encourages public officials to undertake independent action on issues of public importance without fear of consequences. *Mitchell,* 472 U.S. at 525, 105 S.Ct. 2806. Although the ATSA grants immunity to private air carriers, it does so to encourage those carriers to take action on issues of public importance, such as avoiding air piracy and other threats to national security, without fear of consequences. The members of Congress who enacted the ATSA undoubtedly believe that "the safety and security of the civil air transportation system is critical to the security of the United States and its national defense." H.R.Rep. No. 107–296, at 53 (2001), 2002 U.S.C.C.A.N. 589, at 590 (Conf. Rep.). Also, air carriers are in an unparalleled position to provide useful threat information to the federal government because they directly interact with each passenger. Given the importance to our national security of the threat disclosure encouraged by the ATSA and the unique position of air carriers to obtain information about those threats, we must conclude that Congress intended to confer upon air carriers the greatest possible degree of protection by enacting the immunity provision of the ATSA. The immunity conferred by the ATSA is therefore immunity from suit.

¶ 26 Because the protection afforded by such immunity is lost if the air carrier is forced to proceed to trial, we conclude that the trial court must decide immunity under the ATSA as a matter of law before trial. If a factual dispute arises as a part of this inquiry, the trial court may hold a hearing and receive any competent evidence related to the matter. *See, e.g., Trinity Broad. of Denver, Inc. v. City of Westminster,* 848 P.2d 916, 924–25 (Colo.1993) (where a factual dispute arises as to the application of the Colorado Governmental Immunity Act, a trial court should conduct an evidentiary hearing to make necessary findings of fact relevant to the determination). The trial court therefore erred in this case by submitting the immunity question to the jury.

## C. Determination of Immunity

¶ 27 Even where we have found an error, we do not reverse the trial court's judgment if the error is harmless. C.A.R. 35(e); C.R.C.P. 61. Here, the error is harmless because Air Wisconsin is not entitled to immunity under the ATSA.

¶ 28 We have determined that immunity under the ATSA is a question of law to be determined by the trial court. We review questions of law de novo. *Colo. Dep't of Revenue v. Garner*, 66 P.3d 106, 109 (Colo. 2003). Where the determination of immunity turns upon a factual dispute, the trial court should ordinarily conduct a hearing on the matter and make appropriate factual findings. *See Trinity Broad.*, 848 P.2d at 925. Here, however, we are in essentially the same position as the trial court when Air Wisconsin renewed its argument at the close of evidence that it was entitled to immunity under the ATSA. We therefore need not remand the case to the trial court for an evidentiary hearing because we have sufficient evidence before us to conclude as a matter of law that Air Wisconsin is not entitled to immunity.[5]

¶ 29 The ATSA provides that "[a]ny air carrier ... who makes a voluntary disclosure of any suspicious transaction relevant to a possible violation of law or regulation, relating to air piracy, a threat to aircraft or passenger safety, or terrorism" to certain officials including the TSA "shall not be civilly liable" under any law of any state. 49 U.S.C. § 44941(a). This provision, however, does not apply to "(1) any disclosure made with actual knowledge that the disclosure was false, inaccurate, or misleading; or (2) any disclosure made with reckless disregard as to the truth or falsity of that disclosure." § 44941(b).

¶ 30 Assuming, without deciding, that Air Wisconsin's statements related to a "suspicious transaction" relevant to a threat to aircraft or passenger safety, we conclude based on the record evidence that the statements were made with reckless disregard as to their truth or falsity.[6] Although federal cases provide little guidance on the meaning of "reckless disregard" under section 44941(b), cases discussing actual malice pursuant to *New York Times Co. v. Sullivan*, 376 U.S. 254, 280, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), are instructive because the actual malice standard also includes the concept of reckless disregard.

¶ 31 Under *New York Times*, in certain circumstances a plaintiff must establish that a speaker published a statement with "actual malice," that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* To establish reckless disregard under this rule, the statements must have been made despite the speaker having a "high degree of awareness of ... probable falsity," or the speaker must have "entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968); *see also Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 667, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). We believe that reckless disregard under the ATSA encompasses this same standard and we therefore apply it to this case.

¶ 32 First, the evidence establishes that Doyle told TSA: (1) that he believed Hoeper to be mentally unstable; (2) that Hoeper had been terminated earlier that day; and (3) that Hoeper may have been armed. Although the events at the training may have warranted a report to TSA, as discussed below, we conclude these three statements overstated those events to such a degree that they were made with reckless disregard of their truth or falsity.

¶ 33 Testimony from the record demonstrates that, when he made the statements, Doyle knew that Hoeper expected to be fired for failing the test and that Hoeper had become very angry with Schuerman at the testing facility. Based on these minimal facts alone, Doyle could not form an opinion as to whether Hoeper was mentally unstable

---

5. In making this determination, we give no weight to the jury's finding of any fact.

6. In our determination of immunity under the ATSA, we need not, and therefore do not, decide whether the statements were true or false. Rather, we conclude that Air Wisconsin made the statements with reckless disregard as to their truth or falsity. Because we conclude that Air Wisconsin is not immune under the ATSA, the trial court properly submitted the case to the jury. Accordingly, the jury was entitled to determine the elements of the defamation claim, including whether the statements were false. We review that determination below in section V.

at the time that Doyle contacted TSA. In fact, Doyle admitted at trial that, based on the information he had when he contacted TSA, he could not determine if Hoeper was mentally unstable. He therefore made this statement with a high degree of awareness of its probable falsity.

¶ 34 In addition, the evidence establishes that Doyle's statement that Hoeper had been terminated that day was false and that Doyle knew it to be false. Although Hoeper likely would be terminated, no termination had yet occurred.

¶ 35 The record evidence also establishes reckless disregard as to Doyle's statement that Hoeper may have been armed. Hoeper could have brought his weapon on the airplane back to Denver only under two factual scenarios. First, Hoeper could have gone through the security checkpoint and signed an FFDO logbook. But if Hoeper had done so, Doyle would have no reason to report that Hoeper may have been armed because TSA would already know that he was armed. Second, Hoeper could have attempted to sneak his weapon through the security checkpoint. Doyle's statement that Hoeper may have been armed implies the assertion of some fact which led him to conclude that Hoeper was armed. But the only fact in Doyle's possession was Hoeper's status as an FFDO pilot and there is no indication in the record that Doyle believed an FFDO pilot would be more likely than any other passenger to sneak a firearm through security. The tenor of the statement therefore suggests much more than FFDO status; the statement implies, for example, that Doyle knew that someone had seen Hoeper with his weapon or that Hoeper had told someone he had his weapon. Doyle's statement that Hoeper may have been armed was therefore made with reckless disregard of its truth or falsity.

¶ 36 Furthermore, the overall implication of Doyle's statements is that he believed that Hoeper was so unstable that he might pose a threat to the crew and passengers of the airplane on which he was scheduled to fly back to Denver. We find, based on our review of the record evidence, that Doyle's actions belie the claim that he believed Hoe-

per to be mentally unstable. When Doyle first heard about the confrontation at the fourth test, he booked Hoeper on the flight back to Denver and had another employee drive Hoeper to the airport. If Doyle truly believed Hoeper posed a threat to employees of Air Wisconsin, he would not have directed an employee to drive Hoeper to the airport. Also, if Doyle believed that Hoeper posed a threat to the crew and passengers of the flight, he could have instructed Hoeper to return to his hotel room for the evening and booked him a flight only when his mental state improved. In addition, Hoeper spent over two hours at the airport waiting for his flight without incident before Doyle finally called TSA. We therefore conclude that, at a minimum, Doyle entertained serious doubts as to the truth of the statement's implication that Hoeper was so unstable that he might pose a threat to aircraft or passenger safety. We emphasize that our conclusion does not require Doyle to be *sure* that Hoeper *actually* posed a threat. Rather, our review of the record evidence leads us to conclude that Doyle did not believe Hoeper to be so unstable that he *might* pose such a threat.

¶ 37 Moreover, Doyle did not document his prior confrontation with Hoeper, which occurred at the second failed test, until after the incident at issue here. Further, the evidence shows that Doyle initially documented Hoeper as a threat only to himself, but later changed his notes to include Hoeper as a threat to others. We draw from these facts the conclusion that Doyle thought he needed additional support to justify the statement that he believed Hoeper to be mentally unstable. We therefore hold that Doyle entertained serious doubt that Hoeper was mentally unstable.

¶ 38 We recognize that important policy considerations underlie the grant of immunity contained in the ATSA. Specifically, evidence in the record indicates that the TSA instructs airlines to report "suspicious transactions" even if they are not sure that a true threat exists. That is, the TSA is the proper authority to assess potential security threats in air travel and early, tentative information from airlines is vital to this task.

¶ 39 Our analysis of ATSA immunity in this case, however, does not chill airlines from reporting to the TSA what they actually know about potential security threats and leaving the assessment of each potential threat to TSA officials. In this case, for example, Air Wisconsin would likely be immune under the ATSA if Doyle had reported that Hoeper was an Air Wisconsin employee, that he knew he would be terminated soon, that he had acted irrationally at the training three hours earlier and "blew up" at test administrators, and that he was an FFDO pilot. Doyle's statements in this case, however, went well beyond these facts and we conclude that the statements were made with reckless disregard as to their truth or falsity. Air Wisconsin is therefore not entitled to immunity under the ATSA.

### III. Actual Malice

¶ 40 Having determined as a matter of law that Air Wisconsin is not entitled to immunity under the ATSA, we also must address the other issues upon which we granted certiorari that Air Wisconsin contends require reversal of the jury's verdict. We granted certiorari to review the court of appeals' determination that a de novo review of the record demonstrated clear and convincing evidence of actual malice pursuant to *New York Times*, 376 U.S. at 280, 84 S.Ct. 710. We conclude that clear and convincing evidence supports a finding of actual malice.

¶ 41 Because First Amendment constitutional protections apply, where a private plaintiff brings a defamation suit based on statements involving a matter of "public concern," the plaintiff must demonstrate actual malice to recover presumed or punitive damages. *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 756, 105 S.Ct. 2939, 86. L.Ed.2d 593 (1985) (plurality opinion). The parties in this case dispute whether the statements involved a matter of public concern and whether the jury awarded presumed damages. We need not decide these questions, however, because we conclude that Hoeper sufficiently demonstrated actual malice.

¶ 42 As discussed above, a finding of actual malice is a finding that a speaker published a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times*, 376 U.S. at 280, 84 S.Ct. 710. To establish reckless disregard, the statements must have been made despite the speaker having a "high degree of awareness of ... probable falsity," or the speaker must have "entertained serious doubts as to the truth of his publication." *St. Amant*, 390 U.S. at 731, 88 S.Ct. 1323; *see also Harte–Hanks*, 491 U.S. at 667, 109 S.Ct. 2678.

¶ 43 The question of whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law. *Harte–Hanks*, 491 U.S. at 685, 109 S.Ct. 2678. Although credibility determinations are reviewed under the clearly erroneous standard, a reviewing court must nonetheless "examine for [itself] the statements in issue and the circumstances under which they were made to see ... whether they are of a character which the principles of the First Amendment ... protect." *Id.* at 689–90, 109 S.Ct. 2678 (quoting *New York Times*, 376 U.S. at 285, 84 S.Ct. 710). We must therefore undertake an independent review of the entire record to ensure that clear and convincing evidence supports a finding of actual malice. *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 514, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984); *see New York Times*, 376 U.S. at 286, 84 S.Ct. 710.

¶ 44 Under our de novo review of ATSA immunity above, we concluded that Air Wisconsin made statements to the TSA with reckless disregard of their truth or falsity. For the same reasons, we also conclude that our independent review of the record reveals clear and convincing evidence to support a finding that Air Wisconsin made the statements with reckless disregard as to their truth or falsity. Accordingly, we hold that no First Amendment protections bar Hoeper's recovery of presumed or punitive damages in this case.

### IV. Opinion

¶ 45 Air Wisconsin contends that its statements were not actionable under the First

Amendment because they were opinion. We disagree.

¶ 46 In all cases raising First Amendment issues, appellate courts must make an independent examination of the record to ensure that the judgment "does not constitute a forbidden intrusion on the field of free expression." *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (quoting *Bose*, 466 U.S. at 499, 104 S.Ct. 1949). We therefore review de novo whether the statements in this case were protected as opinion.

¶ 47 The United States Supreme Court has disavowed the creation of an "artificial dichotomy between 'opinion' and fact." *Id.* at 19, 110 S.Ct. 2695. Because of First Amendment protections, however, statements on matters of public concern "must be provable as false" before liability may attach under state defamation law.[7] *Id.* The parties dispute whether the statements in this case were on matters of public concern. Assuming, without deciding, that they were, we nevertheless conclude that the statements were provable as false.

¶ 48 Even a statement of bare opinion is actionable where it implies an assertion of objective fact. *See id.* at 21, 110 S.Ct. 2695; *Raytheon Technical Servs. Co. v. Hyland*, 273 Va. 292, 641 S.E.2d 84, 91 (2007). For example, if a speaker says, "In my opinion Jones is a liar," the speaker implies knowledge of facts which lead to the conclusion that Jones told an untruth. *Milkovich*, 497 U.S. at 18, 110 S.Ct. 2695. This statement is therefore actionable. *Id.* at 18–19, 110 S.Ct. 2695.

¶ 49 Also, where a speaker states the facts upon which he bases his opinion, but those facts are incorrect or his assessment of them is erroneous, the statement may still imply a false assertion of fact. *Id.*

¶ 50 In this case, intending to report a suspicious transaction relevant to a threat to aircraft or passenger safety, Doyle told

TSA that Air Wisconsin officials "were concerned about [Hoeper's] mental stability." Even if, as Air Wisconsin contends, this statement is one of opinion, it implies knowledge of facts which lead to the conclusion that Hoeper was so mentally unstable that he might constitute a threat to others on his flight. These facts are thus provable as false and the statement is actionable.

¶ 51 Also, Doyle told TSA that Hoeper was an "[u]nstable pilot in FFDO [who] was terminated today." It appears that Doyle's statement that Hoeper was terminated that day was a fact upon which he based his conclusion that Hoeper was unstable. But that fact was incorrect because although Hoeper knew he would likely lose his job after failing the fourth test, he had not been terminated by the time Doyle called TSA. The statement thus implies a false assertion of fact.

¶ 52 We therefore conclude that the statements are provable as false and are thus not protected under the First Amendment as opinion.

## V. Substantially True

¶ 53 We determined above that Air Wisconsin is not immune under the ATSA and therefore the trial court properly submitted the case to the jury. The jury was thus correctly charged with determining the elements of the defamation claim, including whether the statements were false. Air Wisconsin contends that its statements were substantially true and therefore we must reverse the jury's verdict in favor of Hoeper. We disagree.

¶ 54 Under Virginia law, the jury decides whether a statement was true or false, and we limit our review to whether sufficient evidence supports the jury's determination. *Jordan v. Kollman*, 269 Va. 569, 612 S.E.2d 203, 207 (2005).

---

7. The Supreme Court left open the question of whether this analysis applies to statements made by non-media defendants. *Milkovich*, 497 U.S. at 19–20 n. 6, 110 S.Ct. 2695. Virginia, however, appears to apply this analysis to non-media defendants under its constitution. *Raytheon Technical Servs. Co. v. Hyland*, 273 Va. 292, 641 S.E.2d 84, 90–91 (2007). We therefore address the question even though Air Wisconsin is a non-media defendant.

¶ 55 The plaintiff has the burden to prove that the statement is false. *Id.* Speech that is "substantially true" will not support a defamation claim, and a plaintiff may not prove falsity based upon "[s]light inaccuracies of expression." *Id.*

¶ 56 This defamation claim, however, does not rely upon "slight inaccuracies." Rather, the crux of the defamatory statements was that Hoeper was so mentally unstable that he might constitute a threat to aircraft and passenger safety. The record reveals sufficient evidence to support the jury's determination that Hoeper was not mentally unstable. Specifically, the record includes evidence that, although Hoeper lost his temper and "blew up" at one test administrator, Hoeper did not exhibit any other irrational behavior, and no other person who interacted with Hoeper after the confrontation believed Hoeper to be mentally unstable or believed Hoeper to pose a threat to others at the testing center or the airport. This evidence is substantial and sufficient to support the jury's determination and we therefore will not disturb its verdict.

## VI.  Conclusion

¶ 57 Immunity under the ATSA is a question of law for the trial court to decide before trial. If the issue turns upon disputed facts, then the court may hold an evidentiary hearing and make findings of fact prior to determining immunity. Although the trial court in this case erred by submitting the immunity question to the jury, the error is harmless because we conclude Air Wisconsin is not entitled to immunity. In addition, clear and convincing evidence supports a finding of actual malice, Air Wisconsin's statements were not protected as opinion, and the evidence is sufficient to support the jury's determination that the statements were false. Accordingly, we affirm the judgment of the court of appeals.

Justice EID concurs in part and dissents in part, and Justice COATS and Justice BOATRIGHT join in the concurrence in part and dissent in part.

Justice EID, concurring in part and dissenting in part.

¶ 58 Today the majority upholds a $1.4 million defamation award[1] against Air Wisconsin based on a report it made to the Transportation Safety Agency ("TSA") that it was concerned that one of its pilots, who had just been terminated, was mentally unstable and possibly armed. Although I agree with the majority that the district court should have decided the question of qualified immunity rather than sending the issue to the jury, I disagree with its conclusion that the error was harmless on the theory that the airline was not entitled to immunity in any event. I would hold that Air Wisconsin was entitled to immunity under the Aviation and Transportation Security Act ("ATSA") because the statements it made to the TSA were substantially true. The majority's conclusion otherwise—based on its mistaken view that the airline "overstated" its concerns, maj. op. at ¶ 32—is not only contrary to the report itself, but also contrary to federal airline safety protocols, which require the reporting of potential flight risks even when based on tentative information and evolving circumstances. Because the majority's decision threatens to undermine the federal system for reporting flight risks, I respectfully dissent from all but sections II.A. and B. of its opinion.

¶ 59 The ATSA provides that any airline "shall not be civilly liable" under the law of any state for a "voluntary disclosure of any suspicious transaction relevant to a possible violation of law or regulation, relating to air piracy, a threat to aircraft or passenger safety, or terrorism" to the TSA. 49 U.S.C. § 44941(a). This immunity is lost only if the disclosure is made with "actual knowledge that the disclosure was false, inaccurate, or misleading," or made with "reckless disregard" as to the truth or falsity of the disclosure. *Id.* § 44941(b). This exception to immunity encompasses the standards articulated in *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), including the requirement that the

---

1.  The award consists of $849,625 in presumed damages, $350,000 in punitive damages (reduced from $391,875 in accordance with Virginia law), and $222,123.09 in costs.

plaintiff prove that a statement is false. *Philadelphia Newspapers, Inc. v. Hepps,* 475 U.S. 767, 773–75, 106 S.Ct. 1558, 89 L.Ed.2d 783 (1986) (under *New York Times,* plaintiff must prove that the statement was false and that it was made with knowledge of falsity or with reckless disregard toward whether it was false). Here, this standard cannot be met—and therefore ATSA immunity must attach—because Air Wisconsin's statements to the TSA were substantially true.[2]

¶ 60 The jury verdict in this case states that Air Wisconsin made the following statements to the TSA:

(a) [Hoeper] was an FFDO who may be armed. He was traveling from [Dulles to Denver] later that day and we were concerned about his mental stability and the whereabouts of his firearm.

(b) Unstable pilot in FFDO program was terminated today.

These statements were true in substance.

¶ 61 Beginning with the statements in paragraph (a), it was true that Air Wisconsin *"[was] concerned* about [Hoeper's] mental stability and the whereabouts of his firearm." (emphasis added). Air Wisconsin employees met for one and one-half hours to discuss Hoeper's angry outburst after the failed proficiency—test a test Hoeper knew he had to pass or face imminent termination. *See* maj. op. at ¶ 34. The employees discussed the fact that Hoeper was an FFDO, making it possible that he could be carrying a firearm on board with him on his return flight home. They also discussed two incidents involving

employees from other air carriers: one in which the terminated employee boarded a plane with a firearm, shot the pilots, and caused the plane to crash, killing all on board; and the other in which an employee facing termination boarded a plane intending to crash it into the company headquarters. After these discussions, the Air Wisconsin employees concluded that they had an obligation under federal aviation protocols to report their concerns to the TSA. Because the statements Air Wisconsin made to the TSA were true—the employees were in fact concerned about the risk that Hoeper might pose to airline safety for the stated reasons—they were not actionable under *New York Times* and, accordingly, would fall within ATSA immunity.

¶ 62 The statement in paragraph (b) was also true. The record makes clear that this statement was the subject line of an email written by a TSA operator summarizing Air Wisconsin's call to the TSA.[3] In other words, the TSA used the term "unstable pilot" as a summary of its conversation with Air Wisconsin, in which Air Wisconsin expressed "concern[s] about [Hoeper's] mental stability" referred to in paragraph (a). But even if the statement "unstable pilot" is taken as one used by Air Wisconsin, as the majority mistakenly concludes, maj. op. at ¶ 51, it would be true.

¶ 63 During the proficiency check (which occurred in a flight simulator), Hoeper ran the aircraft out of fuel, flamed out the engines, and nearly crashed. When the train-

2. The majority concludes that whether the statements were true is not part of the ATSA immunity analysis to be determined by the court; instead, the court (and here, the majority) need only decide whether the statements were made with reckless disregard to whether they were false—and, if so, immunity is lost and the case is to be submitted to the jury. Maj. op. at ¶ 30 n.6. To put it differently, the majority believes that ATSA immunity is lost when a statement is made recklessly even though it may be true.

In my view, the majority misinterprets the *New York Times* standard. The Supreme Court has held that although the standard—namely, that a statement must be made "with knowledge that it was false or with reckless disregard of whether it was false or not"—speaks in terms of "fault," rather than "falsity," it requires the plaintiff to show falsity of the statement. *Hepps,* 475 U.S. at

774–75, 106 S.Ct. 1558 (citing *New York Times* and other cases). Therefore, when Congress incorporated the standard into the exception to ATSA immunity, it incorporated the falsity component as well. Even if falsity were not part of the ATSA immunity determination, however, the result would be the same: Hoeper's defamation claim cannot succeed because Air Wisconsin's statements were true and therefore not actionable as defamation. *See id.* at 775, 106 S.Ct. 1558.

3. The subject line and "Quick Summary" section of the TSA email stated: "Unstable pilot in FFDO program was terminated today," which is identical to the language in paragraph (b) of the verdict form.

ing instructor froze the simulator, Hoeper slid back his seat and threw off his headset. In a raised voice he stated that "this is a bunch of [expletive]," that the flight instructor was "railroading the situation," and that the simulation was "not realistic." Realizing that he would not pass the test required by the "Last Chance Agreement" in order to maintain his employment, Hoeper stopped the training and stated, "you win, I'm calling ... [pilot union] legal." Hoeper admitted that he stopped the simulator session, slid his seat back, raised his voice, and used profanity. The flight instructor thought that Hoeper was going to strike him at the time.

¶ 64 After the simulation ended, Hoeper was standing in the lobby acting in an unprofessional manner, talking in a raised voice, and using profanity. When the flight instructor and another Air Wisconsin employee exited the building, Hoeper followed them to the parking lot and yelled at the instructor. Later, when Hoeper called the training center, he was described as "not exactly calm." It is reasonable to conclude from these events that Hoeper was unstable. *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 519, 111 S.Ct. 2419, 115 L.Ed.2d 447 (1991) (speaker is entitled to make statements reflecting a "rational interpretation" of events).

¶ 65 Similarly, the statement in paragraph (b) that Hoeper "was terminated today" was the TSA's, not Air Wisconsin's, as the majority mistakenly suggests. Maj. op. at ¶ 51. But even if Air Wisconsin stated that Hoeper had been terminated, the statement would have been substantially true. As noted above, the Last Chance Agreement provided that Hoeper's continued employment was dependent upon him passing the proficiency test—a test he had failed on three previous occasions. During the test, he stopped the simulator after nearly crashing, said he would "call legal," left the facility, and headed to the airport for a flight home to Denver. Everyone knew—Hoeper included—that he had just failed to pass the test upon which his continued employment depended. Of course, official notification of his termination did not come until the following day, as the majority notes. *Id.* But official notification

was just a formality. Hoeper himself admitted that he expected to be terminated, because, having left the facility without passing the test, he could do nothing to prolong his employment. His employment had, in effect, been terminated. Air Wisconsin's statement was therefore substantially true.

¶ 66 The majority acknowledges that the airline acted properly in making the report to the TSA, but concludes that the report fell outside of ATSA immunity because the airline's statements "overstated ... events to such a degree that they were made with reckless disregard of their truth or falsity." Maj. op. at ¶ 32. The majority then offers what would have been, in its view, the proper wording of the report to the TSA:

> Air Wisconsin would likely be immune under the ATSA if [it] had reported that Hoeper was an Air Wisconsin employee, that he knew he would be terminated soon, that he had acted irrationally at the training three hours earlier and "blew up" at the test administrators, and that he was an FFDO pilot.

*Id.* at ¶ 39.

¶ 67 The majority, in my view, draws hairsplitting distinctions that make no difference to the analysis. It would have made no difference, for example, had the airline reported, as the majority would have it, that Hoeper "knew he would be terminated soon," instead of describing him as terminated. As discussed above, the only thing left with regard to Hoeper's termination was formal notification—and everyone, including Hoeper, knew that was coming. Similarly, there is no difference of any consequence between stating "[Hoeper] had acted irrationally at the training three hours earlier and 'blew up' at the test administrators," as the majority would have it, and stating "concerns" about his "mental stability." As chronicled above, Hoeper's "irrational[ ]" behavior is precisely what caused the airline to have concerns about his mental stability. And, in fact, the airline did convey the underlying facts to the TSA concerning Hoeper's behavior during the training session.[4] Finally, the majority's

---

4. The email written by the TSA operator stated that "[Hoeper] has been very upset and angry

approved statement that Hoeper "was an FFDO pilot" contains the very implication that Air Wisconsin expressed to the TSA—namely that, as an FFDO pilot, Hoeper "may be armed." The majority's approved wording elevates form over substance, contrary to its own recognition that substantially true statements are not actionable. *Id.* at ¶ 55.

¶ 68 The majority is able to find that Air Wisconsin's deviations from the script were substantial only by reading "implications" into the airline's statements that simply are not there. For example, the majority thinks the statement that Hoeper "['was an FFDO who may be armed'] implies the assertion of some fact which led [the airline] to conclude that Hoeper was armed.... The tenor of the statement ... suggests that someone had seen Hoeper with his weapon or that Hoeper had told someone he had his weapon"—an implication that, in its view, was untrue. Maj. op. at ¶ 35. The "implication" that the majority draws, however, is nowhere to be found in the statement itself. Instead, the obvious "assertion of some fact which led [the airline] to conclude that Hoeper was [possibly] armed" was the fact that was actually conveyed to the TSA—namely, that Hoeper, as an FFDO, had access to a TSA-issued weapon. Maj. op. at ¶ 2. It is as if the majority tosses up the overblown "implication" just to have something to swat down as false.

¶ 69 Similarly, the majority reads into the report an "implication" that "Hoeper was so unstable that he might pose a threat to the crew and passengers"—an implication that, again in its view, was false. *Id.* at ¶ 36; *see also id.* at ¶ 56 ("[T]he crux of the defamatory statements was that Hoeper was so mentally unstable that he might constitute a threat to aircraft and passenger safety. The record reveals sufficient evidence to support that jury's determination that Hoeper was not mentally unstable."); *id.* at ¶ 50 (rejecting Air Wisconsin's argument that the statement was one of opinion, on the ground that the statement "implies knowledge of facts

which lead to the conclusion that Hoeper was so mentally unstable that he might constitute a threat to others"); *Hoeper v. Air Wisconsin Airlines Corp.*, 232 P.3d 230, 242 (Colo. App.2009) (resting its decision on the same implication). But again, the majority's "implication" far outstrips the statement itself. Air Wisconsin reported its "concerns" about Hoeper's mental stability—which, as noted above, represented a reasonable interpretation of events. Of course, the majority is correct that a report of a "suspicious" incident such as the one here suggests, at least implicitly, that the suspicions might actually be true. But this implicit suggestion is present in virtually every report to the TSA. Under the majority's rationale, a person who makes a report to the TSA would be exposed to a defamation judgment whenever the possible threat turned out to be a false alarm.

¶ 70 At bottom, the majority's reasoning threatens to eviscerate ATSA immunity and undermine the federal system for reporting possible threats to airline safety to the TSA. The federal reporting system rests on the assumption that airlines should report possible threats to airline safety to the TSA even when the report is based on tentative information and evolving circumstances. The text of the ATSA itself makes clear there is immunity for reporting a "suspicious transaction relevant to a *possible violation* of law or regulation, relating to air piracy, *a threat* to aircraft or passenger safety, or terrorism." 49 U.S.C. § 44941(a) (emphasis added). Moreover, the TSA reporting protocol affirms the tentative nature of the information contained in an airline's report. Prior to the events giving rise to this case, the TSA issued a security directive[5] requiring all airlines to report suspicious activities to the TSA. This directive was part of a fundamental shift in airline security in the wake of 9/11. Prior to 9/11, the airlines were responsible for assessing and investigating possible threats to airline security. After 9/11, the TSA assumed responsibility for such assess-

with Air Wisconsin simulator technicians and other personnel."

5. The security directive is classified. Its general contours were described at trial by Thomas

Blank, who, at the time of the incident, was a high ranking official in the TSA. Blank also testified about the evolution of airline security since 9/11.

ment and investigation. According to the TSA official who testified at trial, "we [the TSA] wanted to know about suspicious incidents" from the airlines, but "we did not want to have the carriers . . . . doing the investigation, the assessment of . . . potential security matters that came to their attention." The post–9/11 policy was known as "when in doubt, report." By its very nature, then, a report of a suspicious incident to the TSA—including the report at issue in this case—is a tentative assessment of an evolving situation based on imperfect information. *Contra* maj. op. at ¶¶ 33–39. The majority's reasoning turns the TSA's "when in doubt, report" policy on its head; in other words, if there is doubt, a report may lead to a hefty defamation verdict.

¶ 71 The majority gives assurances that its "conclusion does not require [the airline] to be sure that Hoeper actually posed a threat." Maj. op. at ¶ 36. But its reasoning belies this assertion, as it repeatedly cites grounds for its decision that are inconsistent with airline safety protocols. For example, it faults Air Wisconsin for making the report when it "could not form an opinion as to whether Hoeper was mentally unstable." Maj. op. at ¶ 33. It also faults Air Wisconsin for failing to investigate the matter sufficiently, *id.* at ¶ 6 (noting that Air Wisconsin "never sought nor received any additional information about the confrontation from others who were at the test center that day or about Hoeper's demeanor after the confrontation"); *id.* at ¶ 7 (Air Wisconsin "never sought nor received any additional information about whether Hoeper actually brought his firearm to Virginia"); *id.* at ¶ 33 (Air Wisconsin made a report "[b]ased on [ ] minimal facts"), and for not taking additional action to prevent Hoeper from boarding the flight. *See id.* at ¶ 36 (noting that, had Air Wisconsin "truly believed" Hoeper was a threat, it would not have booked him on a flight back to Denver and had an employee drive him to the airport); *id.* at ¶ 36 (had Air Wisconsin believed Hoeper was a threat, it could have "instructed [him] to return to his hotel room for the evening and booked him a flight only when his mental state improved"). Finally, the majority stresses that Hoeper was not actually a threat. *Id.* at ¶ 36 (Hoe-

per "spent over two hours at the airport waiting for his flight without incident"); *id.* at ¶ 56 (noting that "although Hoeper lost his temper and 'blew up' at one test administrator, [he] did not exhibit any other irrational behavior"); *id.* ("the record reveals sufficient evidence to support the jury's determination that Hoeper was not mentally unstable"). Under the federal safety protocols, however, none of this is relevant. The majority's concerns fall within the purview of the TSA's investigative authority, not within Air Wisconsin's responsibility. Air Wisconsin reported truthfully that it had concerns about Hoeper given his angry outburst, impending termination, and possible possession of a firearm. Under these circumstances, ATSA immunity plainly attaches.

¶ 72 The fundamental error committed by the majority is that it ignores the overall context in which the report in this case was made. It is easy for an appellate court to write a script for what Air Wisconsin should have said to the TSA after having had the benefit of hours of trial testimony and ample time for appellate review and reflection. But this is exactly the sort of approach the U.S. Supreme Court has rejected. Most recently, the Court summarily reversed a federal appellate decision that had reversed a district court's grant of qualified immunity to suit under 42 U.S.C. § 1983. *See Ryburn v. Huff*, —— U.S. ——, 132 S.Ct. 987, 181 L.Ed.2d 966 (2012) (per curiam). Without merits briefing or oral argument, the Court in *Ryburn* reversed, criticizing the appellate court for, *inter alia*, resting its decision "on an account of the facts that differed markedly from the District Court's finding"; "analyzing the string of events that unfolded . . . [in an] entirely unrealistic" manner; "second-guessing a police officer's assessment, made on the scene"; and making the qualified immunity determination from the perspective of "hindsight and calm deliberation." *Id.* at 991–92. While the *Ryburn* decision addressed the issue of qualified immunity in the context of a suit alleging a Fourth Amendment violation, the Court's admonitions hold true in the ATSA context as well.

¶ 73 Finally, the majority makes a significant procedural error in deferring to the jury

verdict in this case to conclude the statements were false. Although early on in its opinion the majority properly notes that it must decide "as a matter of law" whether Air Wisconsin is entitled to immunity, maj. op. at ¶ 28, it then concludes that there is sufficient evidence in the record to support a determination that the statements made by the airline were false. *Id.* at ¶¶ 54, 57; *see also id.* at ¶ 30 n. 6 (erroneously concluding that falsity is not part of the immunity analysis). But the issue here is not whether the trial court verdict as to falsity can be sustained—that is, whether a rational jury could have decided the way this jury did when the evidence is viewed in the light most favorable to the verdict, *see Western Fire Truck, Inc. v. Emergency One, Inc.*, 134 P.3d 570, 576 (Colo.App.2006)—but rather whether the defendant is entitled to immunity under the ATSA as a matter of law. *See Trinity Broad., Inc. v. City of Westminster*, 848 P.2d 916, 924 (Colo.1993) (noting that the trial court "is the finder of fact" in the Colorado Governmental Immunity context); maj. op. at ¶ 28 (relying on *Trinity* ).[6] Thus, it is

irrelevant that the jury could have rationally concluded that the statements were false (although I would find that a jury could not have so concluded in this case). The issue is whether the statements were false as a matter of law—and they were not.[7]

¶ 74 It may be tempting to dismiss this case as an outlier. Indeed, the case before us appears to be the first reported case rejecting immunity in the ATSA's ten-year history. But a $1.4 million verdict is not easy to dismiss, nor is the majority's troubling rationale, which I fear may threaten to undermine the federal system for reporting flight risks. The majority recognizes that the entire point of immunity under the ATSA is to "encourage [private air] carriers to take action on issues of public importance, such as avoiding air piracy and other threats to national security, without fear of consequences." Maj. op. at ¶ 25. Unfortunately, the majority appears to forget this statement in analyzing whether immunity would apply in this instance. I therefore respectfully dissent from all but section II.A. and B. of its opinion.[8]

6. There is a split in the federal circuit courts with regard to whether federal qualified immunity is a question of law for the court. The majority of circuits have held that it is. *See Curley v. Klem*, 499 F.3d 199, 208–09 (3d Cir.2007) (noting that the qualified immunity issue is a question of law for the court in the "First, Fourth, Seventh, and Eleventh Circuits" and that the Second and Eighth Circuits are moving in that direction). By contrast, the Tenth Circuit permits the court to submit the issue to the jury "in exceptional circumstances where historical facts are so intertwined with the law that a jury question is appropriate as to whether a reasonable person in the defendant's position would have known that his conduct violated the right at issue." *Gonzales v. Duran*, 590 F.3d 855, 859 (10th Cir.2009) (internal quotation omitted). Even under the Tenth Circuit's approach, this case is not one of "exceptional circumstances" requiring a jury verdict, as the relevant facts are rather straightforward.

7. No deference should be paid to any portion of the jury's liability determination given that it was permitted to find liability on standards below those articulated in *New York Times*. For example, instruction 9 applies the preponderance of the evidence standard instead of the more exacting "clear and convincing" standard required by *New York Times*. 376 U.S. 254, 279–80, 84 S.Ct. 710. Further, the jury instructions allowed the jury to find liability where Air Wisconsin was "negligent," contrary to *New York Times*, and

contained the stock recklessness standard (permitting a finding of liability when the actor "consciously disregards a substantial and unjustifiable risk"), rather than recklessness in the *New York Times* sense ("high degree of awareness of [the statement's] probable falsity"). *See Garrison v. State of Louisiana*, 379 U.S. 64, 74, 85 S.Ct. 209, 13 L.Ed.2d 125 (1964) ("only those false statements made with the high degree of awareness of their probable falsity demanded by *New York Times* may be the subject of either civil or criminal sanctions"). Finally, the instructions allowed the jury to reject Air Wisconsin's privilege defense if it found that the statements were "unnecessarily insulting," were "stronger or more violent than was necessary under the circumstances," or were made "because of hatred, ill will, or a desire to hurt the Plaintiff"—again, all inconsistent with *New York Times*. *See, e.g., Harte–Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666–67, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989) (*New York Times* malice should not be confused with malice in the sense of ill will). Affirming the verdict in this case, purportedly as a matter of law, is problematic not only because the jury was deciding something (the immunity issue) it should not have decided, but also because it was deciding that issue under improper standards.

8. Because I would find that the statements made by Air Wisconsin were substantially true, I would find that they could not have been made with

¶ 75 I am authorized to state that Justice COATS and Justice BOATRIGHT join in this concurrence in part and dissent in part.

actual knowledge of, or reckless disregard toward, falsity.