**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**April 15, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

SPACECON SPECIALTY
CONTRACTORS, LLC,

       Plaintiff - Appellant,

v.

RICHARD BENSINGER, an individual,

       Defendant - Appellee.

No. 11-1139

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 1:09-CV-02080-REB-KLM)**

---

Lawrence W. Marquess (Christopher M. Leh, Danielle L. Kitson, and Allison R. Cohn, with him on the briefs), Littler Mendelson, P.C., Denver, Colorado, Attorneys for Plaintiff - Appellant.

Thomas B. Kelley, Levine Sullivan Koch & Schulz, L.L.P., Denver, Colorado (Daniel M. Shanley and Jody Borrelli, DeCarlo, Connor & Shanley, A Professional Corporation, Los Angeles, California; and Steven D. Zansberg, Levine Sullivan Koch & Schulz, L.L.P., Denver, Colorado, with him on the brief), Attorneys for Defendant - Appellee.

---

Before **HARTZ**, **MURPHY**, and **HOLMES**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

## I.    Introduction

Richard Bensinger produced and screened a film about Spacecon Specialty Contractors, LLC.  Claiming the film conveyed several defamatory statements, Spacecon filed suit against Bensinger in the United States District Court for the District of Colorado, based on diversity jurisdiction, asserting a state-law claim for defamation *per se*.  The district court granted Bensinger's motion for summary judgment, concluding the messages conveyed by the film involve matters of public concern and Spacecon did not show Bensinger published the film with actual malice.  Exercising jurisdiction pursuant to 28 U.S.C. § 1291, this court **affirms**.

## II.    Background

Richard Bensinger is a consultant for the United Brotherhood of Carpenters And Joiners of America.  In 2008, Bensinger was asked by David Wilson, the Assistant Director of Organizing for the Carpenters District Council of Kansas City and Vicinity and its Local Union No. 55 (collectively the "Union") to create a film about Spacecon.  Bensinger agreed.  During their initial conversations, Wilson made clear to Bensinger the Union was engaged in a campaign against Spacecon because Spacecon did not pay its employees area standards wages and benefits, *i.e.*, those wages and benefits required by the Union's labor agreements with its signatory contractors.

The film was inspired by a series of local news reports about a group of approximately 100 workers from Mexico who were stranded in Glenwood Springs, Colorado, in late 2007 and early 2008 (the "Stranded Workers" and the "Glenwood Springs incident").  According to the news reports, the workers were brought to Colorado from Mexico by JNS Construction Services, LLC, to work at a hotel project for Midwest Drywall Company, Inc.  After arriving in Colorado, the Stranded Workers were told they were no longer needed for the construction work they were promised.  It appears some did find work but claimed they were paid below minimum wage.  They were housed in a hotel for extended periods of time with as many as ten people per room and inadequately fed.  In January 2008 many of the Stranded Workers filed suit against, *inter alia*, JNS, Midwest, and Leno & Company, a labor broker that allegedly recruited the workers for JNS. The complaint did not name Spacecon as a party or otherwise mention Spacecon.

The Union sent two of its representatives to conduct videotaped interviews of the Stranded Workers.  According to the Union, several of the Stranded Workers stated that Leno told them they were brought to Colorado to work for Spacecon.  After these interviews were conducted, Wilson contacted Bensinger about making the film.

The film is entitled *"Looking the Other Way: Benefitting from Misery."*  It is presented as a documentary and consists primarily of videotaped interviews of

-3-

various individuals, including several foreign construction workers.[1]  The film

addresses alleged abuse and discrimination suffered by these workers, including

under-payment, misclassification of employees as independent contractors, and

trafficking of foreign workers from Mexico.  Some of the alleged abuses are

attributed directly to Spacecon.  The majority of the alleged abuses, however, are

attributed to Leno, which provided laborers to various companies, including

Spacecon.  The film explicitly represents that Spacecon used Leno to obtain

workers for Spacecon projects.  Spacecon does not dispute it used Leno to

provide laborers to supplement its own workforce on three of its projects and was

under contract with Leno at the time of the Glenwood Springs incident.  Spacecon

terminated its relationship with Leno in May 2008.

A significant portion of the film is devoted to the Glenwood Springs

incident.  The film includes videotaped interviews with the Stranded Workers and

excerpts of television and newspaper coverage of the Glenwood Springs incident.

The film also includes interviews and statements from several other

individuals.  One of those individuals is Kevin Ott, President of Swinerton

Builders, a general contractor that has worked with Spacecon.  In the interview,

---

[1]While the parties use the term immigrant worker, it appears from the record the term foreign worker is more appropriate.  A foreign worker is an individual who works in the United States but is a citizen of another country, including both a temporary (nonimmigrant) and a permanent (immigrant) worker. *See* U.S. Citizenship and Immigration Services, *Working in the U.S.*, http://www.uscis.gov/portal/site/uscis (follow "Working in the US" hyperlink) (last updated Jan. 26, 2012).

Ott defends Spacecon. He states that Spacecon has always done a good job for Swinerton, and he has not seen any evidence indicating Spacecon violated the law by using illegal foreign workers. The film also includes statements made by Wilson, who says Spacecon can outbid other contractors because it uses labor brokers and is not paying taxes, which gives it an advantage. The film also includes an interview with Bud Stratton, President of E&K Construction in Denver, who says his company cannot bid projects as low as Spacecon because of how little Spacecon pays its workers, implying Spacecon pays less than E&K.

Bensinger relied on several sources in making the film. He consulted newspaper articles and television reports about the Glenwood Springs incident; newspaper articles about alleged abuse and discrimination suffered by foreign workers at the hands of Leno and Spacecon; the complaint filed by the Stranded Workers; videotaped interviews of the Stranded Workers conducted by members of the Union; interviews he conducted of two of the Stranded Workers; interviews he conducted of other workers alleging abuse and discrimination; and statements and information provided by Wilson, Stratton, and Ott.

Bensinger was compensated for his work on the film as part of a regular $7,500 monthly retainer from the United Brotherhood. The United Brotherhood also reimbursed the expenses Bensinger incurred in making the film. Spacecon claims Bensinger delegated all of the editing and much of the filming to members of the Union, including Wilson, who worked with a graduate film student paid by

the United Brotherhood. Spacecon also claims all of the interviewees Bensinger relied on in making the film were recruited by the Union and that Bensinger, who does not speak Spanish, delegated the interviews in Spanish to Union members.

Shortly before the film was screened but after the screening had been scheduled and invitations distributed, Bensinger sent a letter to John Banks, Spacecon's then-President, and Kirk Lidell, CEO and President of Spacecon's parent company, asking to interview them on camera regarding "allegations made by [Spacecon's] employees and others that concern the abuse of [foreign] labor by Spacecon." Banks responded by letter, stating he would be willing to review the film and provide information necessary to correct any false or misleading statements. Bensinger refused to allow Banks to view the film, but emailed Banks a list of questions regarding the allegations. In his response, Banks denied many of the allegations and provided information directly contradicting some of the messages Spacecon claims were conveyed by the film, *e.g.*, that Spacecon was involved in or responsible for the Glenwood Springs incident.

Following these communications, the film was screened to an audience of approximately fifty people at the Tivoli Center in Denver in March 2009 (the "Tivoli screening"). Bensinger claims the screening was organized and sponsored by Union representatives along with members of the Denver City Council. Councilman Paul Lopez gave a speech at the screening. The screening was followed by a discussion of the policy implications of the film, which was led by

a panel of experts, including experts on human trafficking and misclassification of employees as independent contractors. A copy of Banks's responses to Bensinger's questions was distributed to the audience. The film was also screened on at least two other occasions, once at a monthly Union meeting attended by approximately twelve representatives of various signatory contractors and Union members, and again at a second meeting attended by approximately ten E&K employees and Union members.

Spacecon filed this diversity suit against Bensinger, alleging defamation *per se* under Colorado law based on the messages it claims were conveyed by the film, the invitation to the Tivoli screening, and a poster advertising the film. Bensinger filed a motion for summary judgment, which was granted by the district court. Spacecon appeals, arguing the alleged defamatory statements do not involve matters of public concern, and, even if they do, Spacecon has shown Bensinger published the film with actual malice.

## III. Analysis

### A. Matters of Public Concern

Spacecon argues the messages conveyed by the film do not involve matters of public concern and, therefore, it need not show Bensinger published the film with actual malice. Because the district court granted Bensinger's motion for summary judgment and because, under Colorado law, whether a matter is of public concern is a question of law for the court, this issue is reviewed de novo.

*Quigley v. Rosenthal*, 327 F.3d 1044, 1057-58 (10th Cir. 2003); *Walker v.*

*Colorado Springs Sun, Inc.*, 538 P.2d 450, 459 (Colo. 1975).

The Supreme Court has declined to impose a federal standard of liability

for allegedly defamatory statements about private individuals, instead giving that

responsibility to the States. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347

(1974) ("[S]o long as they do not impose liability without fault, the States may

define for themselves the appropriate standard of liability for a publisher or

broadcaster of defamatory falsehood injurious to a private individual.").[2] The

Colorado Supreme Court has extended the actual malice standard to defamatory

statements about private individuals when the statements involve a matter of

public concern. *Walker*, 538 P.2d at 457; *see also Diversified Mgmt., Inc. v.*

*Denver Post, Inc.*, 653 P.2d 1103, 1106 (Colo. 1982).[3] This standard requires a

---

[2]*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974), held "that the States may not permit recovery of presumed or punitive damages, at least when liability is not based on a showing of" actual malice. In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1985), the Supreme Court clarified that if the allegedly defamatory statement did not involve matters of public concern, a plaintiff may recover presumed or punitive damages even absent a showing of actual malice.

[3]Spacecon asserts it need not show the allegedly defamatory statements were published with actual malice because, under Colorado law, the actual malice standard only applies to defamatory statements published by media defendants and Bensinger is not a media defendant. Colorado, however, does not limit application of the actual malice standard to cases involving media defendants. *Walker v. Colorado Springs Sun, Inc.*, 538 P.2d 450, 457 (Colo. 1975) (holding the actual malice standard applies when "the matter involved is of public or general concern"); *accord Diversified Mgmt., Inc. v. Denver Post, Inc.*, 653 P.2d

(continued...)

plaintiff to show the defamatory statement "was known by the declarant to be false or was made with reckless disregard for its truth." *Quigley*, 327 F.3d at 1058; *accord New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).

Colorado courts have indicated "a matter is of public concern whenever it embraces an issue about which information is needed or is appropriate, or when the public may reasonably be expected to have a legitimate interest in what is being published." *Williams v. Continental Airlines, Inc.*, 943 P.2d 10, 17 (Colo. App. 1996) (quotations omitted).

> [M]ore specifically, a matter is of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it involves the use of names, likenesses or facts in giving information to the public for purposes of education, amusement, or enlightenment when the public

---

[3](...continued)
1103, 1106 (Colo. 1982) (reiterating that *Walker* extended "constitutional protection to *any* discussion involving matters of public concern" (emphasis added)).

Contrary to Spacecon's assertions, neither *Rowe v. Metz*, 579 P.2d 83, 84-85 (Colo. 1978), nor *People v. Ryan*, 806 P.2d 935, 939-40 (Colo. 1991), held otherwise. *Rowe* held that when the reputation of a private plaintiff has been injured by a non-media defendant in a purely private context, and the remarks are defamatory *per se*, the actual malice standard does not apply. 579 P.2d at 85. *Rowe* acknowledged, however, the "need for constitutional protection of freedom of the press and free speech whenever . . . issues of public concern are involved." *Id.* at 84. *Ryan* reiterated the actual malice standard does not apply in situations "where one private person disseminates defamatory statements about another private individual in the victim's community," *i.e.*, "in a purely private context." 806 P.2d at 939. Thus, neither *Rowe* nor *Ryan* held application of the actual malice standard is limited to defamatory statements published by media defendants.

> may reasonably be expected to have a legitimate interest in the subject.

*McIntyre v. Jones*, 194 P.3d 519, 525 (Colo. App. 2008) (citation and quotations omitted); *accord Kemp v. State Bd. of Agric.*, 803 P.2d 498, 503 (Colo. 1991); *see also City of San Diego v. Roe*, 543 U.S. 77, 83-84 (2004) (holding a matter is of public concern when it is "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public").

Whether a matter is of public concern "must be determined on a case-by-case basis." *Williams*, 943 P.2d at 17. "In determining whether statements involve a matter of public concern, [a court] must analyze the content, form, and context of the statements, in conjunction with the motivation or 'point' of the statements as revealed by the whole record." *McIntyre*, 194 P.3d at 525 (quotation omitted); *accord Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011). "[T]he balance should be struck in favor of a private plaintiff if his or her reputation has been injured by a non-media defendant in a purely private context." *Williams*, 943 P.2d at 18; *accord People v. Ryan*, 806 P.2d 935, 939-40 (Colo. 1991); *Rowe v. Metz*, 579 P.2d 83, 84-85 (Colo. 1978). Nevertheless, in Colorado, "[p]ublic concern is interpreted broadly." *Hoeper v. Air Wisc. Airlines Corp.*, 232 P.3d 230, 241 (Colo. App. 2009).

Spacecon claims the film, along with the poster advertising the film and the invitation to the screening of the film, conveyed the following false and

-10-

defamatory messages: (1) "Spacecon was involved with the Stranded Workers and responsible for the Glenwood Springs [incident]," (2) "Spacecon contracts with 'labor brokers,'" including Leno, "knowing at the time that they hire [foreign workers,] that the [workers] will not be covered by workers' compensation insurance[,] that the [workers] will be unpaid or underpaid[,] and that, if paid, the [workers] will be paid without the legally required . . . payment of employment taxes," (3) "Spacecon engages in human trafficking, tax evasion, and insurance fraud," (4) "Spacecon evades taxes by routinely misclassifying . . . its own . . . employees as independent contractors whom it pays without . . . paying employment taxes," (5) "Spacecon mistreats its employees by abusing Hispanic [foreign] workers," and (6) "Spacecon engages in these actions, including human trafficking, tax evasion, and insurance fraud," and contracts with labor brokers like Leno who also engage in these actions, "to lower its labor costs and to submit low bids to win many projects." For purposes of analysis, this court assumes these messages can be inferred and that they are false.

In analyzing content, form, context, and motivation, *McIntyre*, 194 P.3d at 525, Spacecon does not dispute that content weighs in favor of a conclusion the messages involve matters of public concern and makes no argument regarding the form of the messages. Instead, Spacecon's argument is focused on the context and motive. Spacecon asserts the film manifests a purely private context, and that Bensinger's motive in making the film was to harm Spacecon's reputation. In

this manner, it argues the messages conveyed by the film do not involve matters of public concern.

### 1. Context

Spacecon asserts the messages conveyed by the film occurred in a purely private context because they are essentially accusations made by Bensinger, a non-media defendant, against Spacecon, a private company, as part of the ongoing dispute between Spacecon and the Union. Colorado courts have held a statement involves a matter of public concern if its message has the potential to impact many members of the public or the public as a whole. *See Diversified Mgmt.*, 653 P.2d at 1108; *Lewis v. McGraw-Hill Broad. Co.*, 832 P.2d 1118, 1121 (Colo. App. 1992). *Diversified Management* held a matter was of public concern when it involved "alleged widespread and ongoing land-development schemes of questionable propriety," and "the 'public' contained a number of potential buyers who had an abiding interest in the matter." 653 P.2d at 1108. *Lewis* held a statement involved a matter of public concern when it was made "in the context of a persistent and concededly public controversy over [a major retailer's] policies toward minorities, a controversy triggered by publicity surrounding plaintiffs' $15 million lawsuit and their allegations of racially discriminatory policies by [the retailer]." 832 P.2d at 1121.

Colorado courts have also made clear that a statement made in a purely private context does not involve a matter of public concern. *Ryan*, 806 P.2d at

-12-

939; *Rowe*, 579 P.2d at 84-85. In *Ryan*, the defendant, plaintiff's former boyfriend, was charged with criminal libel when he mailed a fictitious "Wanted" poster to several local establishments. 806 P.2d at 936. The poster contained plaintiff's picture and name, and stated she was wanted for, among other things, fraud, spouse abuse, child-abuse, sex abuse, abuse of the elderly, prostitution, assault, and larceny. *Id.* The poster also stated the plaintiff had a venereal disease and was at a high risk for AIDS. *Id.* The defendant filed a motion to dismiss, arguing that, while the criminal libel statute was constitutional as applied to him, it was facially unconstitutional because it did not require a showing of actual malice for false statements about public officials. *Id.* at 937 & n.5. The trial court granted the defendant's motion but the Colorado Supreme Court reversed, holding "[t]he statute remain[ed] valid to the extent that it penalizes libelous attacks under the facts of this case." *Id.* at 937, 941. The court elaborated: "[I]t is inappropriate to require that defamatory false statements must be made with 'actual malice' in situations, such as the present case, where one private person disseminates defamatory statements about another private individual in the victim's community." *Id.* at 939.

Similarly, in *Quigley*, this court held that statements made by an attorney for a civil rights group at a press conference and on a radio show alleging the plaintiffs were anti-Semitic and engaged in anti-Semitic harassment did not involve a matter of public concern under Colorado law. 327 F.3d at 1058-61.

The court noted that, because the statements were made by a non-media defendant and concerned private plaintiffs, "the balance would seem to tip in favor of concluding that the matter was of private, rather than public, concern." *Id.* at 1059-60. It went on to consider, however, whether the matter was of public concern because the statements concerned allegations of religious and ethnic discrimination made as part of a civil lawsuit. *Id.* at 1060-61. While the court acknowledged that, under Colorado law, an allegation of racial or ethnic discrimination likely involves a matter of public concern, it concluded the allegations of discrimination at issue did not. The court first noted the allegations were not asserted against a public employer or an entity or individual with which the general public had contact and concluded "there was no concern that the public's tax dollars were supporting discrimination" or "that members of the public were likely to be harmed or discriminated against." *Id.* at 1061. The court then noted that, because the defendants were intimately familiar with the allegations and the individuals who made them, they knew or should have known the allegations of discrimination were baseless. *Id.*

Here, the messages conveyed by the film have the potential to impact many members of the public or the public as a whole. Like in *Diversified Management*, the public includes current and potential employees, business owners, and government officials who have an abiding interest in matters discussed in the film, such as human trafficking, tax evasion, insurance fraud, and the

mistreatment of foreign workers. Moreover, as in *Lewis*, the film alleges racial and ethnic discrimination and abuse by Leno, a labor broker used by Spacecon and other contractors, and by Spacecon itself, which employs hundreds of individuals.

The facts of this case stand in stark contrast to those in *Ryan*, where the defamatory statements were published by the plaintiff's former boyfriend as part of a personal attack on the plaintiff's character in her community. Unlike in *Quigley*, the allegations at issue here were made against a company with which the general public has contact and thus exposure to discrimination and abuse. Moreover, unlike in *Quigley*, even assuming the allegations of discrimination in the film are false, by virtue of his role in the film's preparation, Bensinger would not have been so intimately familiar with the underlying factual circumstances that he would have known or should have known the allegations were baseless.

While Spacecon points out that the audiences were small and came by invitation, this does not indicate the film was shown in a purely private context. Bensinger announced at the Tivoli screening he intended to release the film widely to the public in the fall of 2009. Indeed, the invitation to the Tivoli screening indicates it was a "pre-release screening" of the film. Moreover, the audience to which the film was screened included elected officials and other policymakers, weighing in favor of concluding it was not shown in a purely private context. *See Kemp*, 803 P.2d at 504 ("[T]he form of the speech—a letter

-15-

to a United States senator, only lends credence to the argument that the speech touched on a matter of public concern."). In addition, the Tivoli screening was organized and sponsored in part by members of the Denver City Council and included a speech by a councilman discussing significant social issues addressed by the film. It was also followed by a panel discussion led by experts on human trafficking and employee misclassification as independent contractors. These facts further illustrate the film was not published in a purely private context. In sum, the context suggests the messages conveyed involve matters of public concern.

### 2. Motivation

Spacecon argues Bensinger's motive in making the film was to benefit the Union by harming Spacecon's reputation and ultimately its business, rather than to expose a public wrong or harm. Spacecon points out that Midwest, a Union signatory, was identified in the newspaper articles and lawsuit as a contractor involved in the Glenwood Springs incident but was never mentioned in the film, even though Bensinger knew Midwest had used Leno. Spacecon also points out that JNS, the company that procured the Stranded Workers' visas, arranged for their travel to Colorado, and was consistently named in the news reports as the party responsible for the Glenwood Springs incident, was barely mentioned in the film. In addition, Spacecon asserts Bensinger's history as a union affiliate, and his current consulting position for the United Brotherhood, indicate he was

unlikely to be concerned with the truth of what he was publishing. Spacecon points out that Bensinger delegated to Wilson and other Union agents the responsibility for procuring interviewees for the film, editing the film, and selecting invitees to the screening, despite knowing the Union and its agents were biased against Spacecon. Finally, Spacecon argues the Union, which sponsored the film, had an ongoing conflict with Spacecon, indicating the film's reference to matters of public concern was intended to mask an attack on Spacecon over a private matter.

In support of its argument, Spacecon relies on *Snyder,* 131 S. Ct. at 1217, and *Sky Fun 1, Inc. v. Schuttloffel*, 8 P.3d 570, 575 (Colo. App. 2000). In *Snyder*, the Supreme Court noted that evidence of a pre-existing conflict between the parties and a resulting motivation to harm may demonstrate that speech on public matters was intended to mask an attack over a private matter. 131 S. Ct. at 1217. In *Skyfun 1*, the Colorado Court of Appeals held, without elucidation, that statements concerning a defendant's abilities as a pilot were not matters of public concern because they were "not made to protect the safety of the flying public, but instead were made in an attempt to preclude defendant's employment with [an] airline." 8 P.3d at 575.

Any pro-union, anti-Spacecon bias on Bensinger's part does not alone indicate he was unlikely to be concerned with the truth of what he was publishing. Spacecon fails to cite any supporting authority to the contrary. Bensinger was a

-17-

consultant for the United Brotherhood, which paid for the film, and he delegated

many of the critical film-making tasks to members of the Union knowing the

Union was embroiled in a campaign against Spacecon. These facts do show

Bensinger may have had a motive to harm Spacecon. *See Snyder*, 131 S. Ct. at

1217. Any such motivation, however, does not necessarily render the messages

conveyed by the film matters of purely private rather than public concern. *See*

*Kemp*, 803 P.2d at 503-04 (holding that even though an employee's statement was

"partially, if not entirely, motivated by self-interest," it nevertheless touched on a

matter of public concern); *accord Connick v. Myers*, 461 U.S. 138, 149 (1983)

(concluding that an employee's statement, which arose out of a personal dispute

with her employer and was aimed at solving a private problem, touched on a

matter of public concern).[4] Other than the dispute between the Union and

Spacecon, there is no evidence supporting a conclusion Bensinger's possible

motive to harm Spacecon demonstrates the film's depiction of public matters was

---

[4]*Sky Fun 1* is not to the contrary. In that unusual case, the trial court found, beyond a reasonable doubt, that the defamatory statements were made maliciously, for the sole purpose of attempting to ruin the career of the subject of the statements. *Sky Fun 1, Inc. v. Schuttloffel*, 8 P.3d 570, 575-76 (Colo. App. 2000). The Colorado Supreme Court has made clear, however, that the mere presence of self-interest will not convert a matter of public concern into a purely private matter. *Kemp v. State Board of Agriculture*, 803 P.2d 498, 503-04 (Colo. 1990). Here, the record reveals the Union's (and, by extension, Bensinger's) dispute with Spacecon revolved around issues that implicated matters of public concern. That the film elucidated those matters of public concern while simultaneously advancing the Union's private interests does not render the matter entirely private. *Id.*

-18-

intended to mask an attack on Spacecon over a private matter. That is not enough.

In sum, while there is some evidence Bensinger's motive in making the film may have been to harm Spacecon, the content, context, and, arguably, the form of the film (a documentary meant to be shown to the public), support the conclusion the messages involve matters of public concern. Therefore, Spacecon must show Bensinger published the film with actual malice.

### 3. The Dissent

According to the dissent, the panel majority errs in considering Bensinger's knowledge of falsity or reckless publication of false statements in analyzing whether his statements implicate a matter of public concern. Dissenting Op. at 1-10. This court's opinion in *Quigley*, however, mandates just such an analysis. *Quigley* began its analysis of Colorado's public-concern doctrine by noting the statements at issue in that case, allegations of "religious and/or ethnic discrimination," would generally be "sufficient to trigger public concern." 327 F.3d at 1060. It concluded the statements did not, however, implicate Colorado's public-concern doctrine because, inter alia, the speaker knew the allegations were "baseless" and/or "not colorable." *Id.* at 1061. That is, *Quigley* specifically held that, as a matter of Colorado law, a defendant's knowledge of the falsity of a statement or his reckless publication of a false statement bears on whether that

statement implicates a public concern.[5]  Pursuant to this court's construction of

Colorado law, a statement whose falsity is so apparent that it is "baseless" does

not implicate a matter of public concern.  *Id.*  This panel is bound by *Quigley*'s

interpretation of Colorado law.  *See Stauth v. Nat'l Union Fire Ins. Co. of*

*Pittsburgh*, 236 F.3d 1260, 1267 (10th Cir. 2001) ("[A]ny panel of this Court

[must] follow an earlier panel's interpretation of state law, absent a supervening

---

[5]In concluding the allegations of discrimination did not touch a matter of
public concern, *Quigley* concluded as follows:

> [M]ost importantly, [the defendants] were intimately familiar with
> [the facts surrounding the allegations of discrimination].  Unlike a
> third-party (e.g., newspaper reporter) unfamiliar with the parties to a
> lawsuit or its underlying facts, [the defendants] were in a position to
> know, and indeed knew or should have known, that the allegations in
> the . . . lawsuit were baseless.  Accordingly, we are unable to
> conclude that [the plaintiffs'] comments at the press conference and
> on the radio show involved matters of "public concern" since [they]
> knew or should have known . . . the . . . allegations of racial
> discrimination/harassment were not colorable.  *See Kemp v. State Bd.*
> *of Agric.*, 803 P.2d 498, 504 (Colo.1990) ("When an employee
> alleges a colorable claim that a university is guilty of racial
> discrimination, it is a matter of public concern.") (emphasis added);
> *see generally Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979)
> ("those charged with defamation cannot, by their own conduct, create
> their own defense"); *Snead v. Redland Aggregates, Ltd.*, 998 F.2d
> 1325, 1330 (5th Cir.1993) ("A speaker cannot turn his speech into a
> matter of public concern simply by issuing a press release.").  We
> agree with the district court that the statements made by [the
> plaintiffs] at the press conference and during the radio show did not
> involve matters of public concern.

*Quigley v. Rosenthal*, 327 F.3d 1044, 1061 (10th Cir. 2003).

-20-

declaration to the contrary by that state's courts or an intervening change in the state law.").

The dissent begrudgingly acknowledges *Quigley* "contains language that supports the position of the panel opinion." Dissenting Op. at 7. The dissent nevertheless asserts that because the entire panel agrees the statements at issue here involve matters of public concern, this panel should simply ignore *Quigley*. Dissenting Op. at 10 ("Although we cannot violate precedent, we have no obligation to cite it. There is ample precedent to support this panel's (unanimous) view that the statements here were on a matter of public concern without relying on *Quigley*. I would think it better practice not to cite precedent for a highly questionable proposition unless that precedent appears to require a result that would not otherwise obtain.").[6] Alternatively, the dissent asserts this panel should engage in its version of best practices by engaging in an extended critique of *Quigley* so "litigants and courts can anticipate [its] possible overruling." Dissenting Op. at 10. While tips on opinion writing are appreciated, those offered by the dissent are inapt.

_____

[6]The dissent's suggestion to ignore the holding in *Quigley* is puzzling given the extensive dissent in *Quigley on this very issue*. As does the dissent in this case, the dissent in *Quigley* interpreted Colorado law to require a court to assume the truthfulness of an allegedly defamatory statement in resolving the question of public concern. 327 F.3d at 1076 (Hartz, J., dissenting). The dissent in *Quigley* is built on a premise irreconcilable with *Quigley*'s holding that knowledge of falsity is pertinent to the question of public concern. *Id.* at 1061. Likewise, the dissent here is irreconcilable with *Quigley*'s holding that knowledge of falsity is pertinent to the question of public concern. Dissenting Op. at 1-10.

In any event, the dissent's assertion that truth or falsity is obviously irrelevant to the public concern analysis is simply not borne out by the case law. The federal circuits are divided over this very issue. *See Westmoreland v. Sutherland*, 662 F.3d 714, 720-21 (6th Cir. 2011) ("[O]ther courts have divided over whether intentionally or recklessly false statements fall outside the protection of the First Amendment, or whether such falsity is to be weighed as part of the *Pickering* balancing."). This court has specifically held truth or falsity *is relevant* to the question whether a given statement implicates a matter of public concern:

> Presumably, the issue of the truth or falsity of the statements at issue is relevant to both the threshold public concern analysis and the balancing required under *Pickering*. It is difficult to see how a maliciously or recklessly false statement could be viewed as addressing a matter of public concern. Nonetheless, a merely erroneous statement may be of public concern. *See Brasslett v. Cota*, 761 F.2d 839, 844 (1st Cir.1985). Similarly, under *Pickering*'s balancing test, as the First Circuit noted in *Brasslett*, an employer will have a significant interest in "curtailing deliberate falsehoods," while the employee's interest in making such statements will, of necessity, be slight, whereas merely "erroneous statements of public concern will be protected unless they are shown to have interfered with the employee's performance or the regular operation of his governmental agency." *Id.* at 844. We address the falsity issue here, in the context of our public concern analysis, but note that the finding that a statement is or is not maliciously or recklessly false is a factor to be considered in both the public concern and the *Pickering* balancing analyses.

*Wulf v. City of Wichita*, 883 F.2d 842, 858 & n.24 (10th Cir. 1989).[7] Likewise, as

noted in *Quigley*, there is at least some reason to believe Colorado follows a

similar approach, as its highest court has indicated only "colorable" claims of

racial discrimination will relate to a public concern. *Kemp*, 803 P.2d at 504 (cited

in *Quigley*, 327 F.3d at 1061). As a consequence, especially when coupled with a

complete lack of briefing on the issue, this is not an appropriate setting to critique

this court's binding precedent in *Quigley*. Nor, for those same reasons, is it

appropriate to signal concern to "future litigants and courts [to] anticipate

possible overruling of the precedent" or "alert the state court . . . not . . . to adopt

our precedent." Dissenting Op. at 10.

   As to the dissent's practice pointer that the panel just ignore *Quigley*, it

would instead seem to be the better practice to note, rather than ignore, a directly

applicable precedent that is cited and discussed extensively in the parties' briefs.

---

[7]To reiterate, the point of departure with the dissent is the question whether a speaker's knowledge of the falsity of his statements is relevant, under Colorado state law, to this court's public concern analysis. As even the dissent recognizes, *Quigley* is dispositive of this question. Dissenting Op. at 7. We note the lack of clarity on the precise parameters of the public concern doctrine in federal case law not in an effort to definitively define the doctrine, but instead to demonstrate the general weakness in the dissent's assertion that *Quigley* is so clearly incorrect that this panel has an obligation to say so.

**B.    Actual Malice**

"Whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law."  *Lockett v. Garrett*, 1 P.3d 206, 210 (Colo. App. 1999); *accord Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 685 (1989); *see also Kuhn v. Tribune-Republican Publ'g Co.*, 637 P.2d 315, 318 (Colo. 1981).  To meet its burden of showing actual malice, Spacecon must show by clear and convincing evidence Bensinger published the film with knowledge of its falsity or in reckless disregard of the truth.  *Lewis*, 832 P.2d at 1122-23; *accord Diversified Mgmt.*, 653 P.2d at 1109; *see also DiLeo v. Koltnow*, 613 P.2d 318, 323 (Colo. 1980) (holding the clear and convincing standard of proof must be applied at the summary judgment stage); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252-57 (1986) (same).  To show reckless disregard, "the plaintiff must demonstrate that the defendant in fact entertained serious doubts as to the truth of the statement, or acted with a high degree of awareness of its probable falsity."  *Lewis*, 832 P.2d at 1123 (citations omitted) (affirming summary judgment for defendant-speaker); *accord St. Amant v. Thompson*, 390 U.S. 727, 731 (1968); *Garrison v. Louisiana*, 379 U.S. 64, 74 (1964); *Diversified Mgmt.*, 653 P.2d at 1110 (adopting *St. Amant's* definition of reckless disregard).  "That a reasonably prudent person would not have published the defamatory statements or would have investigated before publishing does not suffice."  *Lewis*, 832 P.2d at 1123.

Spacecon argues the evidence shows Bensinger either knew the messages conveyed by the film were false or acted in reckless disregard of whether they were true. In support of this argument, Spacecon relies on two categories of evidence: (1) evidence regarding the film's preparation; and (2) evidence regarding two specific messages conveyed by the film. As set out below, Spacecon's arguments in this regard are unconvincing. That is, viewing the evidence and drawing all reasonable inferences in Spacecon's favor, no reasonable juror aware of the entire context surrounding the production and dissemination of the film could conclude by clear and convincing evidence that Bensinger included falsehoods in the film knowingly or with a reckless disregard for the truth.[8]

---

[8]*Cf. Air Wisc. Airlines Corp. v. Hoeper*, No. 09-SC-1050, 2012 WL 907764, at *9 (Colo. March 19, 2012) ("[A] reviewing court must . . . examine for itself the statements in issue and the circumstances under which they were made to see whether they are of a character which the principles of the First Amendment protect. We must therefore undertake an independent review of the entire record to ensure that clear and convincing evidence supports a finding of actual malice." (alterations, citations, and quotation omitted)); *Harte-Hanks*, 491 U.S. 695-96 ("The question whether the evidence in the record in a defamation case is sufficient to support a finding of actual malice is a question of law. This rule is not simply premised on common-law tradition, but on the unique character of the interest protected by the actual malice standard. Our profound national commitment to the free exchange of ideas, as enshrined in the First Amendment, demands that the law of libel carve out an area of breathing space so that protected speech is not discouraged." (quotations, citations, and footnote omitted)).

**1.    Evidence Surrounding the Film's Preparation**

Spacecon asserts evidence regarding the film's preparation shows Bensinger knew the messages conveyed by the film were false or entertained serious doubts as to whether they were true. Spacecon argues Bensinger had a motive to make a false film about Spacecon to tarnish its reputation because he is a consultant to the Union, a long-time union official, and knew the Union was engaged in a campaign against Spacecon. Spacecon further asserts that Bensinger, knowing the Union and its members were biased against Spacecon, delegated critical film-making tasks to them, including the selection of interviewees and editing of the film, without appropriate direction and without independently investigating the truth of the messages conveyed. Spacecon minimizes Bensinger's inquiry of Spacecon for its side of the story because it occurred a mere two weeks before the Tivoli screening, when preparations for the screening were finalized and the film was nearing completion. Moreover, Spacecon argues when Banks provided information directly contradicting the film's messages, Bensinger chose not to investigate further, but instead screened the film the following day. Lastly, Spacecon asserts Bensinger allowed the film to be screened before it was complete, despite being under no time pressure to do so, because the Union was anxious to show it.

The evidence does suggest Bensinger may have had a motive to harm Spacecon. The motivation behind a publication is a factor to consider in

determining whether the evidence shows a publisher acted with actual malice. *Harte-Hanks*, 491 U.S. at 668;[9] *see also Burns v. McGraw-Hill Broad. Co.*, 659 P.2d 1351, 1362 (Colo. 1983). "[C]ourts must be careful," however, "not to place too much reliance on [motive]." *Harte-Hanks*, 491 U.S. at 668. A publisher's motive in publishing a story cannot, by itself, provide a sufficient basis for finding actual malice. *Id.* at 665; *accord Old Dominion Branch No. 496 v. Austin*, 418 U.S. 264, 281-82 (1974) (stating that ill will toward the plaintiff or bad motives are not elements of actual malice and are insufficient standing alone to support a finding of actual malice). Thus, the evidence of Bensinger's pro-union bias is not enough to show he acted with actual malice. *Harte-Hanks*, 491 U.S. at 665; *Tavoulareas v. Piro*, 817 F.2d 762, 795 (D.C. Cir. 1987) (stating that a publisher's "adversarial stance" may be "fully consistent with professional, investigative reporting" and is not necessarily "indicative of actual malice" (quotations omitted)).

---

[9] While Colorado law governs in this case, Colorado courts adopted and have consistently applied the Supreme Court's definition of actual malice to cases involving private plaintiffs and matters of public concern. *See, e.g.*, *Diversified Mgmt.*, 653 P.2d at 1106; *Walker*, 538 P.2d at 453, 456; *Kuhn v. Tribune-Republican Publ'g Co.*, 637 P.2d 315, 318-19 (Colo. 1981). There is no reason to believe Colorado would discontinue this practice. *See Wade v. EMCASCO Ins. Co.*, 483 F.3d 657, 666 (10th Cir. 2007) ("Where no controlling state decision exists, [a] federal court must attempt to predict what the state's highest court would do."); *see also id.* (stating that in attempting to predict what the state's highest court would do, a federal court may seek guidance from "the general weight and trend of authority in the relevant area of law" (quotation omitted)).

Bensinger's delegation of critical film-making tasks to members of the Union does not supply the necessary further evidence of actual malice. There is no evidence supporting Spacecon's claim Bensinger did not provide appropriate direction to these individuals or failed to investigate the truth of the messages conveyed. Indeed, the evidence is to the contrary. For example, Bensinger testified he instructed those conducting interviews to allow interviewees to speak in their own words and encourage interviewees to tell the truth. Moreover, Bensinger was present for and directed many of the key interviews, including interviews with five of the workers featured most prominently in the film. At most, this evidence shows much of the film-making was done by individuals with biases and motives similar to those of Bensinger, which merely bolsters the conclusion Bensinger may have made the film with a motive to show Spacecon in a bad light.

That Bensinger waited until days before the Tivoli screening to seek comment from Spacecon regarding the messages conveyed by the film is not evidence of actual malice because Bensinger had no obligation to seek comment from Spacecon. *See Fink v. Combined Commc'ns Corp.*, 679 P.2d 1108, 1111 (Colo. App. 1984) (stating a publisher "without a high degree of awareness of their probable falsity, may rely on statements made by a single source even though they reflect only one side of the story" (quotations omitted)). Moreover, Bensinger was not required to accept Banks's denials of the film's allegations as

-28-

conclusive, or prefer them over apparently creditable accusations. *See Seible v. Denver Post Corp.*, 782 P.2d 805, 809 (Colo. App. 1989); *accord Lewis*, 832 P.2d at 1124; *see also Harte-Hanks*, 491 U.S. at 691 n.37 ("[T]he press need not accept denials, however vehement; such denials are so commonplace in the world of polemical charge and countercharge that, in themselves, they hardly alert the conscientious reporter to the likelihood of error." (quotation omitted)). Finally, while evidence Bensinger allowed the film to be screened before it was complete, despite being under no time pressure to do so, may be evidence of actual malice, *see, e.g.*, *Kuhn*, 637 P.2d at 319, there is no such evidence here. Bensinger admitted he wanted to do further work on the film but he also testified he considered the film ready for viewing.

In any event, Spacecon fails to acknowledge the evidence suggesting a more balanced approach by Bensinger. Bensinger interviewed Kevin Ott, who in the past had responded to Union criticism of Spacecon. Although Ott was unable to respond to the allegations at issue, the favorable comments he provided about Spacecon were included in the film. Bensinger also attempted interviews with Joe Effies, a Spacecon supervisor, and Kirk Lidell, the CEO of Spacecon's parent corporation, but both refused. Finally, Bensinger attempted to interview Banks on camera to obtain Spacecon's perspective. That interview was declined unless Bensinger permitted Banks to review the film beforehand. Bensinger therefore

distributed Banks's written responses to Bensinger's questions to the audience at the Tivoli screening.

In sum, notwithstanding the evidence suggesting Bensinger may have had a motive to harm Spacecon, that evidence standing alone is not enough to show actual malice. Furthermore, the other evidence Spacecon relies on regarding the creation and exhibition of the film does not in any way evince actual malice. Thus, this court moves on to consider the particular messages conveyed by the film to determine whether that evidence, coupled with Bensinger's motive to harm Spacecon, could allow a reasonable jury to conclude, by clear and convincing evidence, Bensinger published the film with knowledge of its falsity or in reckless disregard of the truth. *Lewis*, 832 P.2d at 1122-23.

## 2. Particular Messages Conveyed by the Film

Spacecon argues the evidence shows Bensinger knew certain of the messages conveyed by the film were false, entertained serious doubts as to whether they were true, and fabricated some of the messages. Spacecon's argument focuses on two specific messages conveyed by the film: that Spacecon was involved in or responsible for the Glenwood Springs incident and that Spacecon used unscrupulous labor brokers to underbid competitors. Spacecon also asserts this case is similar to two cases where the Colorado Supreme Court concluded statements were published with actual malice.

-30-

### a. The Message that Spacecon was Involved in or Responsible for the Glenwood Springs Incident

Spacecon asserts none of the newspaper articles Bensinger relied on concerning the Glenwood Springs incident mention Spacecon, much less attribute fault to Spacecon.  Moreover, Spacecon points out the lawsuit filed by the Stranded Workers does not include Spacecon as a defendant.  Thus, Spacecon argues Bensinger essentially relied on a single, biased source for the film's message that Spacecon was involved in or responsible for the Glenwood Springs incident—Wilson, a representative of the Union, which Bensinger knew was involved in a campaign against Spacecon.  Moreover, Spacecon argues Bensinger neglected to corroborate Wilson's allegations by contacting "obvious unbiased sources," including the lawyer who represented the Stranded Workers, the media that reported on the Glenwood Springs incident, or Spacecon.

It is true that neither the lawsuit filed by the Stranded Workers nor the vast majority of the newspaper articles regarding the Glenwood Springs incident implicate Spacecon in that incident.  One Aspen Daily News article, however, quotes Wilson as stating that several of the Stranded Workers "said they had been promised work on a Spacecon project in Aspen."  Wilson apparently told Bensinger the same thing.  In cases "involving the reporting of a third party's allegations, recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Harte-Hanks*, 491

U.S. at 688 (quotation omitted). That Bensinger knew Wilson was involved in a dispute with Spacecon and may have been biased against Spacecon is not evidence Bensinger had obvious reasons to doubt Wilson's veracity or the accuracy of his report. "Actual malice cannot be proven simply because a source of information might also have provided the information to further the source's self-interest." *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 715 (4th Cir. 1991). "Self-interest (and the related desire to place opposing views and persons in an unfavorable light) motivates many news sources; if dealing with such persons were to constitute evidence of actual malice on the part of a reporter, much newsgathering would be severely chilled." *Id.*; *see also Hotchner v. Castillo-Puche*, 551 F.2d 910, 914 (2d Cir. 1977) ("Knowledge of [a source's] ill-will does not by itself prove knowledge of probable falsity."); *Fink*, 679 P.2d at 1111 (stating that a publisher "without a high degree of awareness of their probable falsity, may rely on statements made by a single source even though they reflect only one side of the story" (quotations omitted)).

Even assuming, however, that a publisher has obvious reason to doubt the accuracy of a story, no actual malice can be inferred should the publisher act reasonably to dispel the doubt. *See Masson v. New Yorker Magazine, Inc.*, 960 F.2d 896, 900 (9th Cir. 1992). There is evidence Bensinger did exactly that. He personally interviewed Manuel Mijangos and Jose Paz Aguirre, two of the Stranded Workers, who confirmed they were told by Leno they were brought to

-32-

Colorado to work for Spacecon. These confirmations were consistent with Bensinger's knowledge that Spacecon had used Leno as a labor broker, and that Leno brought workers to the United States from Mexico. These confirmations were also consistent with allegations made by workers at a separate work site, the Residences at Little Nell. Laborers at the Little Nell site alleged they were mistreated by both Leno and Spacecon and were not paid for "their short stints on the job."[10] The reporting on the allegations at Little Nell certainly adds credence to Leno's assertions Spacecon was involved with the Stranded Workers.

_____

[10]An article in the Aspen Daily News upon which Bensinger relied in preparing the film, reported as follows:

> Three more people have come forward alleging worker mistreatment by subcontractors on the Residences at Little Nell cited in Aspen.

> A supervisor working for Leno and Company—a labor broker recently fired from the Residences job—corroborated complaints from a labor union that Leno was running a "crooked" operation that cheated both workers and the government through improprieties in the payroll.

> And two laborers who said they were hired by Leno for the Residences project said they also were mistreated by Spacecon Specialty Contractors . . . and were not paid at all for their short stints on the job in January.

> . . . .

> [The laborers] said they were supposed to be on Leno's payroll, but a Spacecon foreman and superintendent were their day-to-day bosses. The Mexican men said they were told to hurry up, were called racial epithets and were "treated like animals" in comparison with the white laborers . . . .

-33-

Bensinger had no obligation to corroborate this allegation further by contacting the lawyer who represented the Stranded Workers in their lawsuit or the media that reported on the Glenwood Springs incident.  While a publisher's "failure to pursue the most obvious available sources of . . . corroboration or refutation" is evidence of actual malice, *Kuhn*, 637 P.2d at 319, a mere failure to pursue all possible sources is not, *Lewis*, 832 P.2d at 1123-24.  Spacecon asserts these are "obvious unbiased sources," but it does not explain why.  Nor does Spacecon indicate what these sources may have revealed, if anything, had Bensinger contacted them.  *See Desnick v. American Broad. Cos.*, 233 F.3d 514, 520 (7th Cir. 2000) (holding that a failure to investigate does not indicate actual malice unless the plaintiff indicates "what follow up would have revealed").  Thus, Bensinger's failure to contact these particular sources is not evidence of actual malice.  In sum, Spacecon has not met its burden of showing this message was published with actual malice.

###   b.    The Message that Spacecon Uses Unscrupulous Labor Brokers to Underbid Competitors

Spacecon argues Bensinger relied solely on the allegations of two individuals he knew were biased against Spacecon for the film's message that Spacecon uses unscrupulous labor brokers, including Leno, to underbid competitors—Wilson, and Bud Stratton, who is the president of one of Spacecon's competitors.  Moreover, Spacecon asserts Bensinger knew or should have known

that neither Wilson nor Stratton were privy to Spacecon's business decisions or could have any knowledge of how Spacecon arrives at its bid numbers. Thus, Spacecon argues Bensinger acted with actual malice by failing to view their allegations with a healthy degree of skepticism and failing to verify their allegations.

The fact Bensinger knew or should have known both Wilson and Stratton were biased against Spacecon is not evidence Bensinger had obvious reasons to doubt their veracity or the accuracy of their reports. *See Reuber*, 925 F.2d at 715; *Hotchner*, 551 F.2d at 914; *Fink*, 679 P.2d at 1111. Even assuming, however, that knowledge of Wilson's and Stratton's biases did give Bensinger obvious reasons to doubt their veracity or the accuracy of their reports, that these two sources corroborated each other's allegations sufficiently establishes Bensinger dispelled those doubts. *Masson*, 960 F.2d at 900; *Lewis*, 832 P.2d at 1123-24. It was also reasonable for Bensinger to assume both Wilson and Stratton would know that Stratton's company, E&K Construction, had been substantially underbid by Spacecon on more than one project and what the workers on those projects were paid. Both men were in positions suggesting some credible knowledge on these matters. Furthermore, as noted above, the Aspen Daily News article regarding mistreatment/nonpayment of workers at the Little Nell work site by Spacecon and Leno corroborates the assertion Spacecon was engaged in unscrupulous labor practices. It is certainly fair to infer from this reporting that Spacecon's practice

of using a labor broker that did not always pay its workers allowed Spacecon to underbid its competition.[11]

The presentation of these statements as allegations, rather than as truth, further weighs against a conclusion Bensinger published them with actual malice. *Harte-Hanks*, 491 U.S. at 695 (Blackmun, J., concurring). Presenting an informant's "allegations as though they were established fact would [show] markedly less regard of their possible falsity," as opposed to portraying them "*as allegations.*" *Id.* In the film, Wilson is shown standing in front of a Union picket line when he makes his allegations. The caption "Dave Wilson is a union organizer for the carpenters' union based out of Kansas City" appears on the screen as Wilson is speaking. Stratton is shown standing in front of a construction site. As he is speaking, the caption "Bud Stratton is President of E&K Construction in Denver" appears on the screen. By identifying the speakers by name and position, their statements are presented as their allegations, not absolute truths. In sum, Spacecon has not met its burden of showing Bensinger published these statements with actual malice.

### c. Colorado Case Law

In support of its arguments, Spacecon likens this case to the Colorado Supreme Court's decisions in *Kuhn* and *Burns*. In *Kuhn*, the court held the

---

[11]For this very reason, the dissent's assertion about Bensinger relying exclusively on two obviously biased sources in support of this statement, Dissenting Op. at 12, is contrary to the record.

evidence was sufficiently clear and convincing that a jury could have concluded a newspaper article, which reported that city officials improperly accepted complimentary ski passes, was published with reckless disregard for the truth. 637 P.2d at 316, 319.  The reporter in *Kuhn* admitted he had no basis for most of the erroneous statements, failed to corroborate the allegations even though no time pressure existed to publish, and failed to pursue "obvious available sources of possible corroboration or refutation." *Id.* at 319.  The court concluded the reporter's failure to verify the statements in the article "meant that many of the 'facts' about the ski passes 'exposed' by the article, were, essentially, fabrications." *Id.*

In *Burns*, the Colorado Supreme Court held a jury could reasonably find with convincing clarity that a defamatory statement made during a television broadcast was made with reckless disregard of its truth.  659 P.2d at 1361.  The broadcast, which told the story of a sergeant severely injured in an explosion, stated that the sergeant's wife and children deserted him after the accident.  *Id.* at 1354.  The reporter based this statement on her interview with the sergeant, whom she knew was "frustrated and bitter over the events surrounding his injuries and the divorce." *Id.* at 1361-62.  The court noted that "[a]ny self-serving description by [the sergeant] of the relationship between himself and his wife would warrant careful scrutiny," should have been "viewed with a healthy degree of skepticism," and should have been "verified by investigation." *Id.* at 1362.  The reporter,

however, "failed to investigate other sources of possible corroboration or refutation" even though she "was under no time pressure to finish her story." *Id.* Moreover, the reporter knew the sergeant and his wife were having marital difficulties even before the accident, the wife had compelling reasons for divorcing the sergeant, and the wife had filed for divorce prior to the accident. *Id.* Finally, the reporter testified she had no basis for the statement. *Id.* The court held the reporter's use of the term "deserted," which has "obvious pejorative connotations[,] without underlying factual support is evidence of recklessness especially when the reporter has knowledge that the description is in fact untrue." *Id.*

Here, unlike in *Kuhn* and *Burns*, the messages conveyed by the film were supported by multiple reliable sources. Bensinger made an effort to corroborate allegations. There is no evidence Bensinger had knowledge the messages conveyed by the film were in fact untrue. Finally, there is no evidence Bensinger failed to pursue obvious available sources for corroboration or refutation. Thus, unlike in *Kuhn* and *Burns*, the evidence in this case does not suggest the messages conveyed by the film were fabricated or otherwise published with reckless disregard for the truth. *See also Fink*, 679 P.2d at 1111 ("Although a complete failure to investigate sources of corroboration of published statements may be evidence of actual malice, where an adequate investigation is conducted it is

unnecessary that the truth of each and every statement be supported by the evidence." (citations omitted)).[12]

In sum, having considered the entire record, Spacecon has not come forward with clear and convincing evidence Bensinger published the film knowing its messages were false or with reckless disregard as to their truth. Thus, Spacecon has failed to set forth sufficient evidence to prove Bensinger published the film with actual malice.

### d. The Dissent

The crux of the dissent is two-fold: (1) in affirming the grant of summary judgment, the majority has usurped the function of the jury and adopted a "jaundiced" view of Spacecon's evidence; and (2) specifically regarding the Stranded Workers, the record would support a jury determination of actual malice. Neither assertion is convincing.

According to the dissent, the majority has failed to afford to Spacecon the solicitation it normally affords to a party opposing summary judgment. In so arguing, the dissent misapprehends the relative roles of the court and jury in defamation cases. The Supreme Court has made clear that in considering actual

---

[12]Spacecon also asserts Bensinger knowingly omitted key facts, including that Spacecon was not a defendant in the Stranded Workers' lawsuit, was not implicated by the media in the Glenwood Springs incident, no longer worked with Leno, had only worked with Leno on three projects, and was not the only contractor to use Leno. Whether Bensinger did so, however, is irrelevant to the actual malice inquiry. *See NBC Subsidiary (KCNC-TV), Inc. v. Living Will Center*, 879 P.2d 6, 15 (Colo. 1994).

malice, courts are obligated to engage in a heightened level of review. *Harte-*

*Hanks*, 491 U.S. 688-89; *Bose Corp. v. Consumers Union of U.S., Inc*, 466 U.S.

485, 514 (1984) (specifically holding that the clear-error standard of review does

not apply to a jury's determination of actual malice). In this particular context,

"the Court has been reluctant to give the trier of fact's conclusions presumptive

force and, in so doing, strip a federal appellate court of its primary function as an

expositor of law." *Miller v. Fenton*, 474 U.S. 104, 114 (1985). The Court has

likewise made clear that "the determination of whether a given factual dispute

requires submission to a jury must be guided by the substantive evidentiary

standards that apply to the case." *Liberty Lobby*, 477 U.S. 255.[13] As noted above,

---

[13]In this regard, the Supreme Court has reasoned as follows:

Just as the "convincing clarity" requirement is relevant in ruling on a motion for directed verdict, it is relevant in ruling on a motion for summary judgment. When determining if a genuine factual issue as to actual malice exists . . . a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability . . . . For example, there is no genuine issue if the evidence presented in the opposing affidavits is of insufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence.

Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden. This conclusion is mandated by the nature of this determination. The question here is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not. Whether a jury could reasonably find for either party, however, cannot be defined except by the criteria governing

(continued...)

-40-

Colorado has fully embraced the Supreme Court's precedents regarding actual

malice. *See supra* n.8. In particular, the Colorado Supreme Court has

incorporated into Colorado law the searching standard set out by the Supreme

Court in *Harte-Hanks*. *Air Wisc.*, 2012 WL 907764, at *8-9. That being the case,

the dissent is off the mark in asserting the majority has not been appropriately

solicitous of Spacecon's evidence.

Nor is the dissent correct in asserting the majority has failed to consider in

the aggregate each piece of evidence identified by Spacecon as supporting the

existence of actual malice. Consistent with *Air Wisconsin*, this court has

considered the film and the circumstances under which it was made to determine

whether a reasonable juror could conclude the statements contained in the film

were made with actual malice. *Id.* In so doing, this court has considered both the

evidence Spacecon identifies as supporting actual malice, as well as the evidence

and circumstances indicating a lack thereof. Exercising that independent review,

we readily conclude no reasonable juror could conclude Bensinger made or

displayed the film with knowledge that it contained falsehoods or with reckless

---

[13](...continued)
what evidence would enable the jury to find for either the plaintiff or
the defendant: It makes no sense to say that a jury could reasonably
find for either party without some benchmark as to what standards
govern its deliberations and within what boundaries its ultimate
decision must fall, and these standards and boundaries are in fact
provided by the applicable evidentiary standards.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 254-55 (1986).

disregard of potential falsehoods.[14]  This conclusion is equally applicable to those

aspects of the film relating to the Stranded Workers.  Although a reasonable juror

could perhaps conclude a prudent person would not have conveyed the impression

Spacecon was involved with the Stranded Workers, and that Bensinger was

negligent in so doing, a review of the entire record, as summarized above, reveals

---

[14]The dissent's one-sided view of the evidence may be appropriate in a
more common summary judgment setting.  It is not, however, appropriate in
analyzing the sufficiency of the evidence to support actual malice in a Colorado
defamation case. In such a case, this court must "'examine for itself the
statements in issue and the circumstances under which they are made to see
whether they are of a character which the principles of the First Amendment
protect.'" *Air Wisc.*, 2012 WL 907764, at \*9 (quoting *Harte-Hanks*, 491 U.S. at
689-90) (alterations omitted).  This requires "an independent review of the entire
record to ensure that clear and convincing evidence supports a finding of actual
malice," *id.*, an approach not taken by the dissent.  While it is certainly true that
at the summary judgment stage, "[t]he evidence of the non-movant is to be
believed, and all justifiable inferences are to be drawn in his favor," this court
must still view that evidence in light of the entire record to determine whether
Spacecon's evidence "is of insufficient caliber or quantity to allow a rational
finder of fact to find actual malice by clear and convincing evidence." *Liberty
Lobby*, 477 U.S. at 255.  Nor is the dissent correct in proceeding at this stage on
the presumption the jury could simply choose not to believe Bensinger's
evidence, particularly evidence Spacecon did not contest at the summary
judgment stage. *Id.* at 256 ("We do not understand [our precedents] to hold that a
plaintiff may defeat a defendant's properly supported motion for summary
judgment in a . . . libel case . . . without offering any concrete evidence from
which a reasonable juror could return a verdict in his favor and by merely
asserting that the jury might, and legally could, disbelieve the defendant's denial
of . . . legal malice.  The movant has the burden of showing that there is no
genuine issue of fact, but the plaintiff is not thereby relieved of his own burden of
producing in turn evidence that would support a jury verdict.").

insufficient evidence Bensinger, in fact, possessed a "high degree of awareness of probable falsity." *Harte-Hanks*, 491 U.S. at 688.[15]

## IV. Conclusion

The crux of the challenge to summary judgment is that Bensinger had a motive to portray Spacecon falsely. The evidence supporting that bias is undisputed but it does not support the legal conclusions that the film did not involve matters of public concern or that the film was published with actual malice. As a consequence, this court **affirms** the district court's grant of summary judgment.

---

[15]If the record revealed nothing more than the limited array of facts set out in the dissent, we would agree the Stranded Worker issue should go to the jury. *Harte-Hanks*, 491 U.S. at 688. Although the efforts were ineffective for the reasons set out in the dissent, Bensinger did undertake to corroborate Wilson's statements by interviewing the Stranded Workers. Nothing in the record even hints at the possibility those efforts were pretextual. Furthermore, as Bensinger was well aware, Spacecon had a preexisting relationship with Leno. Spacecon does not dispute it used Leno to provide laborers to supplement its own workforce on three of its projects and was under contract with Leno at the time of the Glenwood Springs incident. This connection between Leno and Spacecon, verified by reporting in the Aspen Daily News about the Little Nell incident, certainly bolsters Leno's assertion Spacecon was involved with the Stranded Workers. When considered within the context of all the circumstances surrounding the production and dissemination of the film, no reasonable juror could conclude Bensinger had a sufficiently culpable state of mind to satisfy the actual malice standard.

11-1139 - *Spacecon Specialty Contractors, LLC v. Bensinger*

**HARTZ**, Circuit Judge, dissenting:

I respectfully dissent. The panel opinion assumes that the film implied that "Spacecon was involved with the Stranded Workers and responsible for the Glenwood Springs incident," and that this implied message was false. Op. at 11 (brackets and internal quotation marks omitted). But it holds that Spacecon produced insufficient evidence that Bensinger acted with malice. I disagree. In my view, the record would support a finding under the clear-and-convincing-evidence standard that Bensinger published the message with reckless disregard for its truth.

There is, of course, much in the panel opinion with which I agree. In particular, I share the panel opinion's view that the Colorado Supreme Court would require the plaintiff to prove actual malice to sustain a defamation claim based on a statement involving a matter of public concern, even if the plaintiff is a private individual. And I agree that the allegedly false messages published by Bensinger involved matters of public concern. But I believe it worthwhile to discuss two areas of disagreement. I have already mentioned that I think there was sufficient evidence of malice. Before I turn to that matter, however, I will address what I view as a flaw in the panel opinion's analysis of whether the film was on a matter of public concern.

## I.     THE PUBLIC-CONCERN ANALYSIS

I cannot join the panel opinion's analysis of the public-concern issue.  The panel opinion correctly states Colorado's definition of public concern, which apparently is not intended as a departure from the use of the term by federal courts:

> Colorado courts have indicated a matter is of public concern whenever it embraces an issue about which information is needed or is appropriate, or when the public may reasonably be expected to have a legitimate interest in what is being published.  More specifically, a matter is of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it involves the use of names, likenesses or facts in giving information to the public for purposes of education, amusement, or enlightenment when the public may reasonably be expected to have a legitimate interest in the subject.

Op. at 9–10 (citation, brackets, and internal quotation marks omitted).

The opinion then, however, goes on to indicate, without any analysis of the merits of the issue, that a statement that would otherwise be on a matter of public concern may not be so classified if the publisher of the statement knew of its falsity or published it in reckless disregard of whether it was true.  Under the heading "Context," the public-concern discussion states, "Bensinger would not have been so intimately familiar with the underlying factual circumstances that he would have known or should have known the allegations were baseless."  *Id.* at 15.  And under the heading "Motivation," it says, "Any pro-union bias on

-2-

Bensinger's part does not alone indicate he was unlikely to be concerned with the truth of what he was publishing." *Id.* at 17.

These observations are irrelevant to whether statements are on matters of public concern. In common parlance the "subject matter" of a statement does not encompass either the truth of the statement or whether the publisher of the statement thought it to be true. The case law analyzes whether a statement is on a matter of public concern by looking to its content, form, and context. *See, e.g.,* *Connick v. Myers*, 461 U.S. 138, 147–48 (1983); *McIntyre v. Jones*, 194 P.3d 519, 525 (Colo. App. 2008). Or, as the Supreme Court recently said in *Snyder v. Phelps*, 131 S. Ct. 1207, 1216 (2011), "[I]t is necessary to evaluate all the circumstances of the speech, including what was said [the content], where it was said [the context], and how it was said [the form]." These circumstances are what one refers to in deciding what a statement conveys or "says." To be sure, the context may include "the motivation or 'point'" of the statements. *McIntyre*, 194 P.3d at 525. But the motivation or point concerns only the purpose of the statements; for example, did an employee of the district attorney complain about how the office was run because the public's business was not being performed properly or only because she felt mistreated? *See Connick*, 461 U.S. at 147–49. Knowing the motive or point helps one to assess whether the statement related only to a private concern or to one that would engage public interest. In contrast,

a statement's truthfulness, or the culpability of the publisher of a false statement, does not change what it conveys.

Moreover, it makes no sense to say that the culpability of the publisher of a false statement should be a factor in determining what level of culpability must be shown for the publisher to be liable. In this case the only reason for assessing whether a statement was on a matter of public concern is to determine whether it is necessary that the plaintiff prove that the publisher acted with malice. If the published statement was on a matter of public concern, the plaintiff must show that the publisher knew the statement was false or acted in reckless disregard of whether it was false; if it was not on a matter of public concern, the publisher can be liable if he was merely negligent. *See McIntyre*, 194 P.3d at 523–24. Declaring that malice is a factor in the public-concern calculus must mean that sometimes the presence of malice makes a difference in that calculus; that is, it must mean that on occasion a statement that would otherwise be on a matter of public concern is not on a matter of public concern because it was published with malice. But why say that if the publisher acted with malice (so the statement was not on a matter of public concern), then the plaintiff does not need to prove malice? Including malice in the public-concern analysis accomplishes nothing.

More troublesome, the panel opinion appears to consider a level of culpability less than malice in its analysis of whether a false statement was on a matter of public concern. It uses the phrases "would have known or should have

-4-

known" and "was unlikely to be concerned with the truth." These phrases suggest something short of malice. But free-speech protection could be undermined if courts were to say that a statement is not on a matter of public concern if it was made, say, negligently (or with any culpability less than malice). Instead of having to prove that a statement on a matter of public concern was made with malice, the person claiming to have been defamed could simply prove negligence, because then the statement would not be on a matter of public concern. The panel opinion suggests that other circuits are divided on whether malice is a factor in determining whether a statement is on a matter of public concern. The suggestion, however, is based on a misreading of the cases. The only out-of-circuit case cited is the Sixth Circuit's opinion in *Westmoreland v. Sutherland*, 662 F.3d 714 (2011). It involved a suit by a firefighter complaining that he was fired for criticizing the city council. The opinion must be read in context.

In analyzing a claim that the government has improperly retaliated against an employee based on the employee's speech, the federal courts undertake a five-element analysis derived from a line of Supreme Court opinions originating with *Pickering v. Board of Education*, 391 U.S. 563 (1968). We ask:

> (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5)

-5-

whether the defendant would have reached the same employment
decision in the absence of the protected conduct.

*Dixon v. Kirkpatrick*, 553 F.3d 1294, 1302 (10th Cir. 2009).  Ordinarily, the first

three elements are matters of law for the court and the last two are for the

factfinder.  *See id.*  As in defamation actions like this one, public concern is one

of the elements.  Unlike defamation actions, however, the role of malice has not

been specified by the Supreme Court.  In *Pickering* the Court wrote that it had

"no occasion to pass upon the . . . question whether a statement that was

knowingly or recklessly false would, if it were neither shown nor could

reasonably be presumed to have had any harmful effects, still be protected by the

First Amendment."  391 U.S. at 574 n.6.  That occasion has yet to arise in a

government-employee retaliation case before the Supreme Court, *but cf. United

States v. Alvarez*, 132 S. Ct. 2537 (2012) (invalidating Stolen Valor Act); so

lower courts have had to decide for themselves how to take into account that the

employee made a false statement with malice.

In *Westmoreland* the court addressed the first three elements of the

*Pickering* analysis.  It wrote:

> To establish that his speech was constitutionally protected, a public
> employee must show that he was speaking as a private citizen, rather
> than pursuant to his official duties; that his speech involved a matter
> of public concern; and, if so, that his interest as a citizen in
> commenting on the matter outweighed the interest of the State, as an
> employer, in promoting the efficiency of the public services it
> performs through its employees.

662 F.3d at 718–19 (internal quotation marks omitted). Only after determining that the firefighter's speech "undoubtedly involved matters of public concern," *id.* at 720, did the court consider whether a public employee has no First Amendment claim if his statements were intentionally or recklessly false, or whether such malicious falsehood is merely a factor to be considered in assessing whether the employee's interest in speaking outweighs the government employer's interest. *See id.* at 720–21. The court read its precedent to say that "*Pickering* balancing [the third element] is not required if it is determined that the employee made statements with knowledge of, or reckless indifference to, their falsity." *Id.* at 721.

The split in the circuits that *Westmoreland* referred to is not the same as the split between the panel opinion and this dissent. *Westmoreland* spoke of the circuit differences "over whether intentionally or recklessly false statements fall outside the protection of the First Amendment, or whether such falsity is to be weighed as part of the . . . balancing [test]." *Id.* at 720. In other words, the divide is about whether the presence of malice should be dispositive in public-employment retaliation cases, not whether malice is relevant to the public-concern analysis. The panel opinion accurately quotes *Westmoreland*, but it misinterprets the statement. *Westmoreland* did not view malice as a factor in the public-concern analysis, nor did it say that there was a circuit split on that issue. As far

as I can tell, no other circuit court has held that malice is a proper consideration in assessing whether a statement is on a matter of public concern.

That brings us to precedent in this circuit. It cannot be denied that *Quigley v. Rosenthal*, 327 F.3d 1044, 1061 (10th Cir. 2003), contains language that supports the position of the panel opinion. But it also cannot be denied that *Quigley* does not analyze the issue or provide any rationale for considering malice in assessing whether a statement involved a matter of public concern. It relies on citations to two cases with a "see generally" signal and one with a "see" signal. The first two cases do not address anything close to malice. As for the third, it concerned a state employee who had filed a grievance claiming race and sex discrimination. She requested a closed hearing but she and her husband wrote her senator complaining of the proceedings and suggesting an investigation of "'possible civil rights violations.'" *Kemp v. State Bd. of Agric.*, 803 P.2d 498, 500 (Colo. 1990) (en banc). The state agency then informed her that her violation of secrecy "'voided'" the grievance proceedings, and she sued, claiming retaliation on the basis of her speech. *Id.* at 501. The court wrote the following in addressing whether the employee's speech was on a matter of public concern:

> Although the context within which [the employee's] letter arose was one in which she had a personal stake, it was nevertheless a context in which charges of racial discrimination had been filed. The very purpose of the grievance was to address alleged discrimination, which the grievance manual defines as any act or policy that violates any of a multitude of state and federal anti-discrimination laws, all of which are public matters. Moreover, the

-8-

form of the speech—a letter to a United States senator, only lends credence to the argument that the speech touched on a matter of public concern.

When an employee alleges a *colorable claim* that a university is guilty of racial discrimination, it is a matter of public concern, and the fact that she has a personal stake in the outcome does not alchemize that claim into a purely private matter in which the public has no interest.

*Id.* at 504 (footnote omitted) (emphasis added).

The panel opinion argues that the Colorado court's use of the term *colorable claim* indicates that the court thought the veracity of the plaintiff was a factor in its public-concern analysis. But nothing in *Kemp* suggests that the court was concerned with the employee's veracity. It was apparently using the term "colorable claim" in the sense in which we use it when assessing whether an allegation suffices to convey jurisdiction—our concern is not the veracity of the pleader but whether the allegations (deemed to be true) state the necessary elements. *See, e.g.*, *Iowa Tribe of Kan. & Neb. v. Salazar*, 607 F.3d 1225, 1231–32 (10th Cir. 2010) (Federal Quiet Title Act prohibits suits challenging United States title in Indian trust land. "[T]he Secretary [of the Interior] need only make a colorable claim that the land is held in trust on behalf of an Indian tribe. . . . The very purpose of the doctrine . . . is to prevent a judicial examination of the merits of the government's position." (internal quotation marks omitted)). (We now use the term *plausible claim* in a similar sense in assessing a motion to dismiss for failure to state a claim. *See, e.g.*, *Keith v.*

*Koerner*, 707 F.3d 1185, 1190 (10th Cir. 2013).) *Kemp* does not support the proposition that malice plays a role in the public-concern analysis.

As for the panel opinion's reliance on the footnote in *Wulf v. City of Wichita*, 883 F.2d 842 (10th Cir. 1989)—another case dealing with retaliation against a government employee rather than defamation—we are hardly bound by the undeveloped dictum in that opinion. Moreover, our later opinions have not read *Wulf* as standing for the proposition advanced by the panel opinion. Rather, they view *Wulf* as treating malice not as a factor in assessing public concern but as an independent ground for denying relief. In *Lancaster v. Independent School District No. 5*, 149 F.3d 1228, 1234 (10th Cir. 1998), we wrote:

> Our finding that the speech was not of public concern makes it unnecessary for the court to address whether the interests of the defendant outweighed the plaintiff's interests, *whether plaintiff's speech was knowingly false,* and whether plaintiff's speech was a motivating or a substantial factor for the Board's employment decision. *See Wulf*, 883 F.2d at 856–57 (*noting these are factors to be considered if speech is found to be of public concern*).

(emphasis added). And in *Moore v. City of Wynnewood*, 57 F.3d 924, 932–33 (10th Cir. 1995), we said:

> Defendants' claim that Moore's accusations were false does not alter our conclusion that his speech was of public concern. We may assume that deliberately or recklessly false statements by public employees are either unprotected by the First Amendment or, at least, that such intentional falsity would weigh heavily against protection. *See Pickering*, 391 U.S. at 574, (suggesting that a public employee might lose the protection of the First Amendment for knowingly or recklessly making false statements); *Wulf*, 883 F.2d at 858 & n.24 (suggesting that malicious or reckless false statements would receive

-10-

less protection). However, here Defendants have failed to show either that Moore's statements were false or that Moore made them knowing that they were false or with reckless disregard for their veracity.

So what is to be done with *Quigley*? Although we cannot violate precedent, we have no obligation to cite it. There is ample precedent to support this panel's (unanimous) view that the statements here were on a matter of public concern without relying on *Quigley*. I would think it better practice not to cite precedent for a highly questionable proposition unless that proposition appears to require a result that would not otherwise obtain. Then the issue is clearly postured for en banc review, and correction. Or if the highly questionable proposition must be cited, it is helpful to point out concerns about the proposition so that future litigants and courts can anticipate possible overruling of the precedent. Particularly in a diversity case in which we are "predicting" state law, it could be useful to alert the state court that it may not wish to adopt our precedent interpreting state law.

## II. EVIDENCE OF MALICE

The basis for my dissent, however, is the panel opinion's determination that there was insufficient evidence of malice to overcome the motion for summary judgment. To be sure, a defamation plaintiff seeking to resist summary judgment on the issue of malice—whether the publisher of the statement knew it to be false or acted with reckless disregard of its truth—bears a heavy burden. "[T]he

evidence in the record [must] support a reasonable jury finding . . . that the plaintiff has shown actual malice by clear or convincing evidence . . . ." *Andrews v. Liberty Lobby, Inc.*, 477 U.S. 242, 255–56 (1986); *see Air Wisconsin Airlines Corp. v. Hoeper*, No. 09SC1050, 2012 WL 907764, *9 (Colo. March 19, 2012) (court must "undertake an independent review of the entire record to ensure that clear and convincing evidence supports a finding of actual malice"). When defamation doctrine protects First Amendment interests, courts must be particularly diligent in reviewing the sufficiency of the evidence of liability (although, as noted by the panel opinion, the United States Supreme Court has held that proof of malice is not necessary in a case like the one before us).

Nevertheless, I think that the panel opinion's view of Spacecon's evidence is too jaundiced. We should not forget that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions . . . . The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255 (reviewing summary judgment in defamation case brought by public figures). On several points I question whether the opinion applies that standard. When it says, "Even assuming . . . that knowledge of Wilson's and Stratton's biases did give Bensinger obvious reasons to doubt their veracity or the accuracy of their reports, that these two sources corroborated each other's allegations sufficiently establishes Bensinger dispelled those doubts," Op. at 35, the opinion is apparently

-12-

foreclosing the possibility that a reasonable juror could think that two dubious sources do not add up to one reliable source. And, contrary to the opinion's discussion on page 36, I would also think that a reasonable juror could infer that the film was presenting the statements of those complaining of Spacecon as truth, not merely as allegations. The film was a far cry from a newscast that reports allegations and denials without trying to take sides.

In addition, the approach of the opinion strikes me as misconceived. It pursues a strategy of divide and conquer—addressing separately each item of evidence of malice and saying that it is not sufficient in itself to establish malice—a strategy derided by the Supreme Court in another context (but also addressing the reasonableness of a fact-finding) as contrary to the proper approach of looking at the totality of the circumstances. *See United States v. Arvizu*, 534 U.S. 266, 274 (2002) (reversing decision that officers did not have reasonable suspicion for stopping vehicle). The jury is entitled to look at the evidence holistically. *Cf. Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 326 (2007) (When assessing sufficiency of pleading, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically.")

Most importantly, it seems to me that the panel opinion misses a critical point regarding the reliability of Bensinger's sources for the false statement that "Spacecon was involved with the Stranded Workers and responsible for the

Glenwood Springs incident." Op. at 11 (brackets and internal quotation marks omitted). The opinion, in essence, states that Bensinger did not act with reckless disregard of the truth in relying on two of the workers—and Union representative Wilson, who purported to be merely repeating what workers had told him—who said that they had been told by Leno that they were brought to Colorado to work for Spacecon. But even assuming the veracity of the workers and Wilson, they were providing only hearsay; the reliability of the statement about Spacecon depends on the veracity of Leno. The workers did not say that they had worked for Spacecon. They were relying on what Leno had told them.

It is therefore essential to consider what Bensinger knew about Leno's veracity. And the record indicates that Bensinger not only should have known, but actually believed, that Leno had lied to the workers about whom they were going to be working for in Colorado. The original complaint filed by the Stranded Workers named Midwest Drywall Company as a defendant, alleging that the labor brokers recruited the workers to work for Midwest and were acting as Midwest's agents. Bensinger was familiar with this complaint; indeed, it is shown in the film. The workers' amended complaint, however, withdrew Midwest as a defendant and made it a plaintiff. It alleged that the brokers, including Leno, "falsely asserted to the Department of Labor (DOL) and to the individual Plaintiffs that Midwest was to employ individual Plaintiffs." Aplt. App., Vol. IV at 753. A second amended complaint added specifics about these

-14-

false representations, including allegations that the defendants had submitted forged documents. The evidence would readily permit a jury to find that Bensinger knew about this change in the lawsuit. An article in the Aspen Times reported Midwest's response to the original claims against it and the statement by the Stranded Workers' attorney that "Midwest appears to be stone-cold innocent, and these 69 men have no beef with an innocent local business." *Id.* at 732. Bensinger read the article. He testified in his deposition: "Midwest was named; however, as I say, Midwest was switched from a defendant in the suit because their name was used fraudulently to get those people here. The lawyer in the newspaper says that Midwest was cold-stone innocent in this whole situation." *Id.* at 738–39.

Thus, Bensinger accused Spacecon of misconduct in reliance solely on the credibility of a source—Leno—that he knew had falsely attributed to Midwest the same conduct (hiring Leno to bring the Stranded Workers to Colorado) that Leno allegedly attributed to Spacecon. One would think that a jury could be clearly convinced that Bensinger had acted in reckless disregard of the truth when he did not corroborate Leno's statements about Spacecon despite knowing that Leno had falsely said the same thing about Midwest. Indeed, the Supreme Court has written, "[R]ecklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) (internal quotation

-15-

marks omitted).  I read this statement as saying that if a reasonable juror could find (under the clear-and-convincing-evidence standard) that the publisher had obvious reasons to doubt the veracity or accuracy of its source and nevertheless published as true what the source said, then the juror can properly find malice. That is the situation here.

The panel opinion suggests that Bensinger could credit the allegation against Spacecon because it was supported by allegations concerning mistreatment of workers at the Little Nell site.  That suggestion is misguided.  It is important to keep in mind that Leno, as the labor broker, paid the workers (and was responsible for any withholding from the payments); contractors such as Spacecon paid Leno, not the workers themselves.  Thus, complaints about pay and withholding concerned Leno, not Spacecon.  The specific complaints about Spacecon were limited to racial discrimination in working conditions.  However despicable such discrimination is, it is not evidence of Spacecon's "involve[ment] with the Stranded Workers [who did not work at the Little Nell site]" or its "responsib[ility] for the Glenwood Springs incident."  Op. at 11 (brackets and internal quotation marks omitted).  With respect to that involvement and responsibility, the only thing implicating Spacecon was that it employed Leno as a labor broker in the Glenwood Springs area.  But so did Midwest, and Bensinger believed that Midwest had no connection with (much less responsibility for) the

-16-

Stranded Workers. There was no rational basis for Bensinger to distinguish Spacecon and Midwest in that respect.

In contrast, there is significant evidence that truth was not what motivated Bensinger in producing the film. First, there was his motive. Bensinger prepared the film as part of his $7,500 monthly retainer from a union engaged in an organization campaign against Spacecon. The obvious purpose of the union in financing the film was to make Spacecon look bad; and the obvious motive of Bensinger was to please his employer by achieving that goal.

Also supporting a recklessness finding is Bensinger's failure to check obvious sources, such as the Stranded Workers' attorney or the reporter who wrote the stories about the workers, that could have undermined his attack on Spacecon. In particular, the absence of a claim against Spacecon in any of the complaints filed by the Stranded Workers would have struck any but the most biased observer as highly suggestive. No one would have had more incentive than counsel for those workers to assert that Spacecon was responsible for their plight if there was sufficient evidence of responsibility to support a good-faith claim.

Bensinger's failure to check other sources was not for lack of time. He testified that he began work on the film in "early '08," R., Vol. 11 at 331–32, and he interviewed and filmed Stranded Workers in late June and early July 2008. Yet he did not screen his film until March 2009. During those months (perhaps a

year) he made no effort to contact the reporter or the Stranded Workers' attorney. *See Masson v. New Yorker Magazine*, 501 U.S. 496, 521 (1991) (noting that author "was not working under a tight deadline. Unlike a case involving hot news, [the author] cannot complain that she lacked the practical ability to [check the quotations].")

And Bensinger's efforts to get information from Spacecon hardly displayed a sincere search for the truth. The film shows that on one occasion Bensinger or an assistant showed up at the Little Nell project with a video camera for an ambush interview of a Spacecon supervisor who responded "No comment," when the interviewer said, "I have a question about worker abuse allegations." R., Vol. IV at 637. Later, Bensinger sent a letter from Virginia dated February 23, 2009 (after invitations had been sent for the film's initial screening 17 days later) to Spacecon vice president John Banks in Colorado and the president of Spacecon's parent corporation in Pennsylvania, requesting an on-camera interview about allegations "that concern the abuse of immigrant labor by Spacecon." *Id.*, Vol. VIII at 1837. The letter stated that Bensinger was producing a documentary film that would be released in the summer of 2009 with "several screenings prior to that." *Id.* Banks sent a return letter dated March 3, noting that he had learned that the film had already been scheduled for showing on March 12 and expressing doubts about its objectivity, but stating a willingness to provide information in response to questions if given the opportunity to review the film. Bensinger e-

mailed questions on March 10. Banks, who was not provided a preview of the film, responded. Among other things, he denied that Spacecon had any involvement with the Stranded Workers. The responses were provided to those who attended the March 12 screening. But Bensinger did not refer to them in his remarks. (Of course, "publication of a denial by the defamed subject does not absolve a defendant from liability for publishing knowing or reckless falsehoods [or] . . . in any way vitiate the value of the evidence that defendant published the charge with reckless disregard for truth or falsity." *Connaughton v. Harte Hanks Commc'ns, Inc.*, 842 F.2d 825, 837–38 n.6 (6th Cir. 1988) (brackets and internal quotation marks omitted), *aff'd.*, 491 U.S. 657 (1989).)

Certainly, the evidence does not *compel* a finding that Bensinger acted with reckless disregard for the truth. A jury might well vindicate him. It seems to me, however, that a jury could also properly find malice. I respectfully dissent from the ground on which the panel opinion affirms summary judgment for Bensinger.